## No. 9801.

### J. C. MORRIS VS. EXECUTORS OF L. B. CAIN ET ALS.

### P. S. WILTZ, JR., PUBLIC ADMINISTRATOR, VS. EXECUTORS OF L. B. CAIN ET ALS.

### (Consolidated.)

A contract of mortgage, like that of sale, the object of which was to give preference to one creditor over another, in securing the payment of a just debt, cannot be set aside as fraudulent, unless suit be instituted within one year from the date it was entered into.

An executor is a judicial depositary of property of the estate he represents; and his possession is that of the creditors for whom he is a *quasi* mandatary. Hence, his custody of succession effects, continued by the assent and acquiescence of the heirs, suspends prescription in favor of the creditors whose claims have been acknowledged.

Their acknowledgment by placing them on account or tableau of debts. or appending them to a petition for an order of sale to pay debts, will suffice.

This Court is without jurisdiction to revise a judgment in favor of one who has not, himself, appealed, and who has not made an answer to the appeal of his adversary.

The law does not permit an attorney-at-law to give in evidence anything that has been confided to him by his client without his clients' consent. The privilege is not that of the attorney but of the client. Such testimony is incompetent. It does not matter that the relations of client and counsel have ceased, or that the client be dead.

A mortgage may be consented to secure an obligation which has not yet risen into existence; but in such case the mortgage can only be enforced, in so far as the future obligation shall have been created. It is not necessary that a mortgage should express upon its face that it was executed to secure a future debt.

A mortgage note may be reissued to a third and innocent holder, for value before maturity, without impairing the security of the mortgage, provided it is only a collateral security.

The purport of a bill or note is to be collected from the eight corners of it; and a memorandum on the back, affecting its operation, must be regarded as if written on its face.

A memorandum made *after* the execution of the instrument, with the consent of all parties, will modify and control its future operation in market.

A purchaser of mortgaged property at judicial sale, under proceedings taken for the collection of *one* of a series of mortgage notes, is entitled to *retain* in his hands the surplus of the price beyond the amount taken under the writ of sale, until it is demanded by holders of the remainder of the series; but he owes interest at the rate of five per cent per annum until same is paid over, or deposited, according to law.

The decisions of this Court, which exonerate the purchaser from the payment of interest, were rendered under the Code of 1808, which did not contain the provisions of Art. 2553 of the present Code, and which establish a rule different from that contained in the Code of 1808.

APPEAL from the Civil District Court for the Parish of Orleans. Houston, J.

*Henry C. Miller, W. S. Finney* and *T. Gilmore & Sons* for J. C. Morris and Canal Bank.

*Gus. A. Breaux* for the Public Administrator.

*J. McConnell* and *H. E. Upton* for Defendants.

*T. J. Semmes & Legendre* for Germania National Bank.

*Braughn, Buck, Dinkelspiel & Hart* for M. Frank.

*E. E. Moïse* for Moses Lobe & Co.

*E. D. White, E. T. Florance, Percy Roberts* for Sundry Appellees.

The opinion of the Court was delivered by

WATKINS, J. On the 25th of February, 1878, L. B. Cain executed a conventional mortgage before Bendernagel, notary, in favor of Henry Roos, to whom he acknowledged himself indebted in the sum of $140,-000; and to represent which he executed one series of twenty-four, and another of four notes—twenty-eight in all—of $5,000 each, payable to his own order, and by himself indorsed. The first series of notes are numbered from 1 to 24; those numbered from 1 to 12 became due at the expiration of twelve months, and those from 13 to 24 in two years after their date.

The second series are indicated by the letters A, B, C and D; A and B falling due in one year, and C and D in two years: The first series of twenty-four notes were secured by the mortgage on two improved city lots, situated in the first district; and the second series of four notes, upon the mortgagor's residence property in the fourth district,

All of the notes bear interest at the rate of eight per cent, and the mortgage secures their payment, in the hands of the present or of any future holder.

On the 9th of March, 1878, Henry Roos, the mortgagee, at that time holding eight notes of the first series, viz: Numbers 1, 2, 3, 4, 5, 6, 7 and 10, executed, before Theodore Guyol, notary, an act of preference in favor of J. C. Morris, holder of eleven others of the same series, viz: Numbers 11, 12, 13, 15, 16, 17, 20, 21, 22, 23, 24—for his own account and that of the New Orleans Canal and Banking Company—in which it was stipulated and agreed that those held by Henry Roos should be postponed, in the payment thereof, to those held by Morris and the Canal Bank; and in case of sale being made of the mortgaged property, the proceeds of sale should be first applied to the discharge of the latter, whether same be in their hands or those of some future holder. All the notes, of both series, are paraphed by Bendernagel to identify them with the act of mortgage; and those embraced in the act of preference were paraphed by Theodore Guyol to identify them therewith.

On the 23d of April, 1881, J. C. Morris obtained an order of seizure and sale on six of these *priority* notes, viz: 11, 12, 13, 15, 16, 17—representing $30,000—and caused to be seized and advertised for sale the *two* improved city lots in the. *first* district; and at the execution sale made on the 18th of June, 1881, *one* piece was adjudicated to Moses Lobe & Co. for the sum and price of $67,000; and the other to M. Frank for $27,550—the total price aggregating $94,550.

Of this sum the former paid in cash $10,000 and the latter $5,000— and each retained in his hands the residue.

The fourth district property was not then sold, nor included in the executory proceedings.

On the 27th of February, 1878, L. B. Cain executed before Bendernagel, notary, another act of mortgage upon property in the second district, in favor of H. Roos, or any future holder, to secure the payment of $5,000, evidenced by two promissory notes of $2,000 and $3,000, due at one and two years, and payable to his own order and by himself indorsed.

The executors of Cain took a rule on the purchasers to show cause why they should not pay over to them the surplus of the price above the amount due the seizing creditor; and he took a like rule on the sheriff, for proceeds enough to satisfy his demands, attorneys' fees and cost.

The latter prevailed; but the former was denied, on the ground that the law entitled the purchasers to retain, in their own hands, the surplus, for the purpose of discharging the claims of other creditors holding mortgages on the property purchased, when duly presented for payment.

On the 9th of August, 1881, Moses Lobe & Co. filed an intervention or interpleader in the executory proceedings, in which all claimants to any share in the funds in their hands were cited to appear in court and contest their claims thereto contradictorily with each other, and that the same be decreed to such person or persons as shall effectually disburden the property of encumbrances and pass a clear title to them and enable them to procure the cancellation of all mortgages inscribed against it.

The parties who were cited and appeared are the following, viz:

1. J. C. Morris holding as collateral security the following notes, viz: 11, 12, 13, 15, 16 and 17, aggregating $30,000.

2. Canal Bank, likewise holding five notes, viz: 20, 21, 22, 23 and 24, aggregating $25,000.

3. Germania National Bank, likewise holding five notes, viz: 1, 2, 3, 4 and 19, aggregating $25,000.

4. Henry Roos, likewise holding four notes, viz: 5, 6, 7 and 10, aggregating $20,000.

5. Julius Meyer, likewise holding two of said notes, viz: 8 and 9, aggregating $10,000.

6. David Roos, likewise holding two notes, viz: 14 and 18, aggregating $10,000; also A, B, C and D (second series) $20,000; also two notes, $2000 and $3000 = $5000, making the total of $35,000.

7. Widow Caroline Cain claims $6000 dotal funds she received as an *ante* nuptial gift, evidenced by a marriage contract in 1856, and which were received and used by her husband, L. B. Cain. Said contract was duly recorded long anterior to the execution of the acts of mortgage in question, and she demands the right to be paid in preference to all others.

The *concursus* thus formed was recognized by this Court in Morris vs. Cain, 35 Ann. 759.

During the pendency of the sale under executory proceedings, on the 16th of May, 1881, P. S. Wiltz, public administrator, administering the succession of Benjamin Weil, brought suit against the executors of L. B. Cain upon a claim for $171,000.

On June 1, 1881, he filed a supplementary petition, in which the following substantial averments are made :

1st. That the act of mortgage of the 25th of February, 1878.

2d. That of February 27, 1878.

3d. The act of sale from L. B. Cain to Henry Roos, of the 26th of December, 1879, of property in the sixth district, ——————— are, one and all, fraudulent simulations, and import no verity whatever.

That, prior to their confection, Cain had become financially embarrassed, in consequence of the failure of Alcus, Scherck & Auty, for whom he was indorser for a large amount; that said acts had no real existence, but were unreal, fictitious, fraudulent and simulated—a mere screen and device to secrete and fraudulently cover the property of Cain from the pursuit of creditors.

That Cain was not then, and has not since become, indebted to Henry Roos in any manner, and that the recitals of the acts on this subject are untrue.

That none of said notes were issued to Roos, or anyone else, except those now held by J. C. Morris and the Canal Bank.

He charges that the act of sale was also a fraudulent simulation, and that no cash was paid, and that it was a contrivance intended to defraud his creditors.

He prays judgment declaring all of said transactions to be fraudulent simulations, and null and void, " except in so far as the first (act) may have been legally vitalized *pro tanto* by the issue, as aforesaid, by L. B. Cain to J. C. Morris of eleven notes, before their respective maturities, viz : 1 to 24," and he prays, also, that the inscriptions of said mortgage be erased and cancelled.

By consent of parties, the two suits and proceedings were consolidated for trial and judgment.

The defendants, Henry Roos, David Roos and Julius Meyer, tender a plea of prescription of one year against the action of Wiltz, administrator, in so far as it may be considered and treated as a revocatory action, and in their answer aver the validity of all of said acts of sale and mortgage, and that said mortgage notes were delivered by Cain to Henry Roos as a security for his, then, large indebtedness to him, and such amounts as Cain should *thereafter become indebted to him;* and also to secure Cain's indebtedness to David Roos and Julius Meyer, for whom Henry Roos was agent, and the whole of which, on the 25th of February, 1878, aggregated about $60,000, and was represented in part by due bills, notes and other paper.

They affirm the validity of the act of preference, executed on the 9th of March, 1878, and the right of J. C. Morris and the Canal Bank to be paid from the proceeds of sale in the hands of the purchaser in preference to the *other eight therein named.*

They claim that Julius Meyer, as holder of notes 8 and 9, and David Roos, holding notes 14 and 18, and the Germania Bank, holder of note 19—all of the first series—are entitled to be paid concurrently with J. C. Morris and the Canal Bank, for the reason that none of those five notes were embraced in the act of preference.

They further aver that the other four notes held by the Germania National Bank—1, 2, 3 and 4—were formerly held by Henry Roos, as security, and that when he purchased of Cain the sixth district property, on the 26th day of December, 1879, the price of $7500, mentioned as cash, was *credited on his account,* and that notes numbered 3 and 4 were surrendered to Cain; and that subsequently, on the 13th of September, 1880, Cain paid him $11,000, and this sum was credited on his account, and he then surrendered notes numbered 1 and 2 to Cain.

That said five notes were at those dates overdue, and were, therefore, given in pledge to the Germania Bank as collateral security, but *without any mortgage securing them,* as same had been *extinguished* and had ceased to have existence.

On the other hand the Germania Bank contends that Cain pledged to it all five of said notes during the month of March, 1878; that two of them are evidenced by a written act of pledge of date March 20th, 1878; and that the other three were delivered by Henry Roos to the bank, as security for the account of Cain for a then existing overdraft of $10,000—the first two having been pledged as part security for Cain's demand note of $24,245.

The whole indebtedness of Cain to the Bank at the date of his death, on April 4th, 1881, was reduced to $16,000. L. B. Cain was, on the 25th of February, 1878, president of the Germania Bank; and was previous to that date and subsequently.

The bank denies the validity and binding force of the act of preference and claims that it acquired the five notes before maturity, without any notice of said act; and that, although the paraph of Theodore Guyol, notary, was at the time endorsed upon them, it conveyed no notice, and that, as the act of preference had not been recorded, their acquisition of them was protected by the law merchant, and entitled them to participate in the fund ratably and concurrently with Morris and the Canal Bank.

No one denies that Mrs. Cain's mortgage primes the Roos mortgages, but it is claimed that, as hers is a legal mortgage only and operates equally upon all the real estate of Cain, its payment should be postponed to those creditors claiming under the Roos special mortgage; or, at most, she should only be allowed a distributive share.

The record shows, and the fact is, that the sale under executory proceedings did not embrace Cain's residence property, and which is the property.mortgaged for notes A, B, C and D. Nor did it embrace the Sixth District property, securing $2000 and $3000 notes.

The former was subsequently adjudicated to David Roos at $16,000, and the latter at $4500, at probate sale procured by Cain's executors, but it is claimed that he has not paid the price and the *proces verbal* has been withheld.

The executors of Cain resist the claims of Wiltz, administrator, on account and affirm the validity and reality of the mortgages and sales that are assailed as simulated, and allege the *insolvency* of his succession.

Various ordinary creditors of Cain intervene and unite with Wiltz, administrator, in seeking the annulment of those different acts.

Moses Lobe & Co. announce their willingness to pay over the balance of the purchase price in their hands to whomsoever the court may direct, but they aver that they have been diligently seeking to ascertain the proper parties to whom payment should be made, and have offered to make a deposit of the money, and that they should not be required to pay *interest* as demanded by Roos & Meyer.

J. C. Morris proceeded by rule on the sheriff and other interested parties to coerce the payment of the amount due him under the writ of seizure and sale, and on the 26th of January, 1883, there was paid to him the sum of $37,813.32, the principal and interest due him; the sum of $8,051.28 cost, besides attorneys' fees stipulated in the act.

The amount due the State and city for Cain's taxes was also paid out of the fund under orders of court.

The judge *a quo* pronounced judgment on these numerous and complicated issues substantially as follows, viz:

1. In favor of Weil's succession, as an ordinary creditor of Cain's succession, for the sum of $39,039.63.

2. In favor of Henry Roos for $4,965.98, with eight per cent interest from October 13, 1875; also for the sum of $5,342.34, with like interest from November 23, 1876; also for the sum of $10,420.02, with like interest from January 10, 1877. Less several credits, among which are

the following, viz: on December 19, 1879, $7,500; on August 27, 1880, $9,000; on August 2, 1880, $1,000.

3. In favor of *Julius Meyer*, $3,360, with eight per cent interest from March 27, 1876; also for $3,000, with like interest from April 7, 1876; also for $366, with like interest from July 10, 1876. Less amount paid August 22, 1876, $366.

4. In favor of *David Roos* for $700, with eight per cent interest from December 20, 1876; also for $3,000, with like interest from January 7, 1876; also for $3,735.18, with like interest from January 15, 1878; also for $14,680.27, with like interest from January 1, 1876; also for $4,000, with like interest from March 21, 1878.

The total amount allowed Roos and Meyer aggregate about $70,000, without interest.

5. In favor of Mrs. Caroline Cain $6000, with five per cent interest per annum, from the date of her husband's death, on the 4th of April, 1881, with recognition of legal mortgage on the properties in dispute, and as priming the special mortgages of the 25th and 27th of February, 1878. It also decreed her entitled to be paid from the proceeds, in the hands of the purchasers, the sum of about $2100.

6. In favor of Henry Roos, recognizing the sale to him of the sixth district property as valid.

7. In favor of J. C. Morris, recognizing the payment made to him of his debt, interest, attorney's fees and cost, and the payment of taxes.

8. In favor of Canal Bank and Germania National Bank, entitling them to be paid out of the proceeds of sale.

9. In favor of Moses Lobe & Co , directing them to pay the balance of *capital* in their hands *without interest*, and decreeing the recorder of mortgages to cancel and erase all mortgages against the property purchased by them.

10. Against Henry Roos, David Roos and Julius Meyer, decreeing them *not* to be entitled to participate in the distribution of the proceeds of the sale of the mortgaged property; and directing and requiring them to surrender all the mortgage notes of the first series, held by them, to the executors of Cain, for cancellation, and declaring the mortgage extinguished by confession *pro tanto*.

The decree did not in terms pass upon the question of simulation. The purchaser, Mr. Frank, did not appear or take any part in the proceedings.

From this judgment, Henry Roos, David Roos and Julius Meyer *alone* appeal.

## I.

In this Court *none* of the appellees file answers or ask any amendment of the decree appealed from.

In this Court the Germania Bank and Wiltz, administrator, each file a plea of prescription of five years against all the mortgage notes of Cain that are held by the appellants; and the latter also pleads the prescription of five years against all due bills and obligations alleged by the appellants to have been executed by Cain, and by them introduced in evidence; and three years in bar of any account of theirs against Cain's succession.

We will dispose of the various pleas of prescription first.

## II.

The plea of prescription of one year urged by the appellants is aimed at the action of the public administrator only. An examination of the averments of the petition and the prayer, discloses it to be essentially one in declaration of simulation only—as there is no alternative prayer for the revocation of the acts assailed as having been made in *fraud* of creditors, if not shown to have been simulated.

In Johnson vs. Meyer, 30 Ann. 1204, our immediate predecessors said: "When sales are attacked by a *direct* action, there is no reason why the party may not demand relief from them by alleging simulation or fraud, or both. We are not disposed to hamper the remedies of creditors, who resort to a direct action, by doubtful technicalities."

It may be that the administration of the proof of simulation, will discover the transaction to have been *only a fraudulent* one; and there might arise a state of facts that would entitle the plaintiff to judgment under his prayer for general relief.

Hence we may examine the plea.

A contract giving preference to one creditor over another, in securing the payment of a *just* debt, cannot be set aside under the revocatory action, unless suit be instituted within one year from the date it was entered into. R. C. C. 1987.

In such case it does not matter that the *debtor* was *insolvent* to the knowledge f the creditor with whom he contracted; nor that other creditors were injured thereby.

The two acts of mortgage charged to be simulated are within the provisions of that article.

In Renshaw, Cammack & Co. vs. Herbert, 29 Ann. 285, the Court said: "It appears that the notes secured by the mortgages, and which

were the basis of the judgments attacked, were given in lieu of pre-existing notes held by the mortgagees which were offered in evidence, etc. * * * *

"If there was fraud, which rendered the contracts, mortgages and judgments attacked liable to be set aside at the suit of plaintiff, *it was to secure certain creditors in preference to others.*

"These mortgages had been given more than one year before the institution of this suit to avoid them. * * The plea of prescription must prevail as to the mortgage sought to be avoided." R. C. C. 1987.

"The prescription of one year was pleaded by defendants. The evidence does not sustain the charge of simulation." 24 Ann. 123, Lafitte vs. Daigré; 24 Ann. 246, Brown vs. Kelley; 33 Ann. 965, Conté vs. Cain.

In the event it be ascertained that the charge of simulation preferred against the two acts of mortgage, is not sustained by proof, as a revocatory action, it is prescribed, it having been filed in June, 1881.

In so far as the conveyance of the Sixth District property is concerned, the suit is governed by the provisions of R. C. C. 1994, which limits the right of action to one year from the time the creditor has obtained judgment against his debtor.

### III.

Of the prescription urged against the demands of the appellants, against the succession of Cain.

They resist the plea on the ground that prescription has been both legally interrupted and suspended in different ways.

1. On the 4th of August, 1881, the executors of Cain presented to he Court a petition, accompanied by a statement c f debts, praying for an order of sale of all property remaining in the succession unsold at the time. That property consisted in part of the residence property of the deceased, situated on St. Andrew street, and covered by the mortgage of date February, 1878, securing notes A, B, C and D, and the First street property covered by the mortgage of February 27, 1878, securing the two notes of $2,000 and $3,000, respectively, now claimed by David Roos. This sale was ordered to pay debts. It was sold, among other properties, and brought $21,000; but the fund has not been distributed.

The statement of debts mentions the mortgage notes of Cain held by various parties, on property situated on Magazine and Gravier streets, for $140,000. Also those secured by mortgages on St. Andrew street and sixth district property, for $25,000, and the general mortgage of Mrs. Caroline Cain for $6,000.

46

There are now, and have at all times been, since their qualification, large values in the hands of Cain's executors.

The properties described in the inventory were valued at $236,-430.71.

Independent of the surplus of proceeds of the sale, under executory process, in the hands of the purchasers, there are evidently large values in the hands of the executors.

The acts of mortgage and other evidence in the record show that the appellants have in their possession, and *claim* to have had since the date of their execution, quite a number of Cain's notes, as securities for his indebtedness to them previously existing.

Those are the acts of mortgage and notes previously assailed as simulated by Wiltz, administrator; yet, for the purposes of the *plea* under consideration, we must *assume* their verity and genuineness. Otherwise the controversy would be ended.

In Renshaw vs. Stafford, 30 Ann. 855, our predecessors decided that an executor is a trustee for the creditors of the deceased, and is a judicial depositary of the property of his estate, and his possession is that of the creditors, for whom he is a *quasi* mandatary. And that it "results, further, that the creditors are in possession through this trustee of the property and effects of the estate, which are their common pledge."

"It is the well established jurisprudence of this State that possession, by the creditor himself or by his mandatory, of the pledge securing his debt, operates a suspension of prescription as long as that possession continues." 1 R. 556; 8 R. 145; 11 R. 183.

"As long, therefore, as the heirs of the deceased allow the property of his estate to remain in the custody of the administrator, the trustee of the creditors, the principle stated requires that *prescription at least*, and certainly so far as their debts bear upon the objects of the pledge, be suspended."

In Maraist vs. Guilbeau, 31 Ann. 713, the Court held that a judicial acknowledgment by an administrator, by the filing of an account, is far more solemn and authentic than any writing under private signature. 16 Ann. 260, Succession of Yarbrough.

In 32 Ann. 338, Heirs of Porter vs. Hornsby, the Court held that the filing of a statement of debts was a recognition of the claims of creditors which *suspended prescription during* the administration." 33 Ann. 308, Cloutier vs. Lemee.

In Troueudel vs. De Bouchel, 33 Ann. 753, the Court said: "When the administrator of a succession applies for an order of sale of prop-

erty to pay debts, and annexes to his petition a list of debts to be paid, it is a sufficient acknowledgment to interrupt prescription."

If, therefore, the prescription of the mortgage notes held by Roos and Meyer was *only interrupted* by the mortuary proceedings in August, 1881, they would have taken a new period, which only elapsed in August, 1886, since the present appeal was obtained.

If the proof of judicial acknowledgment, or possession of collaterals by appellants for their demands against Cain, should be deemed insufficient—though it is, in our opinion, ample—the present litigation, with its multifarious issues and pleas, in which the sole object aimed at is a participation in the fund realized by the sale of property mortgaged, would interrupt and suspend prescription as between the litigants.

Cain's executors, as well as his creditors, are parties. They were cited into court by Moses Lobe & Co., in June, 1871, for the expressed purpose of coercing a full and final settlement of all their claims, contradictorily with each other.

The proceeds of sale are in the hands of the purchasers. Appellants appeared in court on the 7th of November, 1881, and contradictorily with the identical parties urging the pleas of prescription, and the executors of their common debtor, claimed that a share of the fund should be applied to the payment of their demands, for the security of which they held and presented some of the mortgage notes.

On the 12th of December, 1881, Cain's executors filed an answer in the suit of Wiltz, administrator, as executor of Cain, in which they aver that the acts of Cain assailed as simulated, are real, genuine and *bona fide* transactions.

That of itself was a judicial acknowledgement sufficient to prevent the notes going to prescription.

We are of the opinion that neither of the pleas can be sustained.

## IV.

In order to bring the discussion of the remaining issues within proper limits, we must first ascertain what issues are presented by this appeal for decision.

In 26 Ann. 451, Succession of Ostrander, a former court said : " He has not appealed from the judgment, or any part thereof, nor has he asked, in *answer* to the administrator's appeal, that the judgment be amended. We can, therefore, pass upon the complaint of the appellant only." 25 Ann. 508, Gnott vs. Easton & Barrow.

In 15 Ann. 434, Converse vs. Robinson, it was said : " It is well settled that this cannot be done without an appeal on the part of the

party complaining. This court is *only seized of jurisdiction to amend the judgment as between appellant and appellees,* and not as between appellees."

" A judgment cannot be disturbed, nor can its correctness be questioned, either in favor of, or against, one not a party to the appeal. ' Hen. Dig., p. 62, vol. 6, and authorities.

" A defendant who has not appealed cannot avail himself of the appeal of his co-defendant." 6 N. D. 598, Plauché vs. Gravier; 6 La. 228, Millaudon vs. Cujas.

" An appellee cannot have a judgment amended in his favor unless he has prayed for it in his answer to the appeal." C. P. 888, 592; Hen. Dig., p. 70; 6 Ann. 7, and authorities.

" When there are several opposing claimants to plaintiffs whose demands were severally passed upon by the judgment below, none of them can be heard on appeal but such as were actually appellants." 8 La. 192, Abot vs. Nartigue; 5 Ann. 140, Succ. of Decoux; 8 Ann. 73, Hood vs. Knox; 10 Ann. 197, Wortham vs. Schenck; 19 Ann. 527, Lynn vs. Lowenthal; 38 Ann. 777, Enders vs. Gingras & Mulhaupt.

The appellees, in the instant case, have neither joined appellants nor answered their appeal. In so far as they are concerned the decree of the Court *a qua* must remain undisturbed.

The effect of this will be that the judgment rendered in the lower court cannot be changed in any of the following respects, viz:

First, as to amount of the debts allowed against the succession of Cain in favor of the succession of Weil; in favor of Henry Roos, David Roos and Julius Meyer; in favor of Mrs. Caroline Cain, with interest and first mortgage; in favor of Henry Roos, recognizing his title to the sixth district property; in favor of J. C. Morris, recognizing the payment to him of the proceeds of the sale of the first district property, to a sufficient amount to discharge his claims against Cain, with interest, attorneys' fees and cost; and in favor of the State and city of New Orleans, recognizing payment of taxes.

V.

It is of first importance that the rights of the appellants should be ascertained before the rank of different creditors is established and their priority determined.

This leads us into the discussion of the charges of simulation of the two acts of mortgage executed by L. B. Cain on the 25th and 27th of February, 1878. But as a necessary preliminary to that discussion, the competency of L. L. Levy as a witness must be passed upon, as his evidence is chiefly relied upon to establish those charges.

It will be borne in mind that L. B. Cain was at the date of these transactions—long before and after—president of the Germania National Bank, one of the litigants in this suit. He executed the mortgages to and in favor of Henry Roos, of this city, to whom he confessed himself a debtor for a large sum, and to secure which the mortgages were apparently executed. The notes were executed and made payable to Cain's own order and by himself endorsed. They fell due at one and two years after date.

Two or three days prior to their execution the firm of Alcus, Scherck & Auty failed in business. L. B. Cain was on their paper as indorser for the aggregate amount of $120,000. Of this paper, about $30,000 was in the hands of the Canal Bank. Cain was indebted to J. C. Morris about $20,000, and to the Germania Bank about $15,000. He also owed large amounts to other persons. On the 9th of March, 1878— only a few days after their execution—Henry Roos was *in possession* of nineteen of those notes, *i. e.*, of the first series. On that day he passed before Theodore Guyol, notary, the act of preference in favor of Morris and Canal Bank, as a *better security*—they being the holders of eleven and Henry Roos of eight. It is of these transactions that Levy testified *in extenso.*

The evidence discloses that he is a duly licensed and practicing attorney at law, and has been a member of the New Orleans bar since 1850; that L. B. Cain was one of his first clients; and that he continued to be his retained counsel generally, as well as his law firm, Cotton & Levy, until a short time before his death, on April 4, 1881. He states in his evidence that on the day of the failure of Alcus, Scherck & Auty, Cain went to his residence to consult him in regard to the calamity that had befallen him, and desired his advice as to how he could shelter himself from disaster. He and Cain consulted the following day at his office and the execution of this mortgage was determined upon. He was present at the office of Bendernagel, notary, when it was executed by Cain and accepted by Roos, acting as the counsel of Cain, if not of Roos. He saw the notes executed and knew all the circumstances under which they were issued. He was present at the office of Theodore Guyol on the 9th of March, 1878, when Roos executed the act of preference. He states that it was on his advice as a lawyer that it was consented and executed.

The proof further shows that for many years previous to all these transactions Major Levy and his firm were the retained counsel of Henry Roos, and different firms of which he had been a member;

though he does not admit that, he acted as counsel for Roos in these particular transactions.

He was confessedly counsel for Cain, one party to them, and Roos was the other. His legal advice embraced them both and availed them both.

Under this state of facts objections were urged on the trial, and earnestly pressed here, to his testimony, on the ground that an attorney at law is *not permitted* to " give evidence of *anything that has been confided to him by his client without the consent of his client.*"   R. C. C. 2283.

An agreement was made to the effect that the witness should make his statements subject to the objection, and that it should be passed upon when the merits were considered.

The objection was made by the executors of Cain and the appellants also.

The objections made are full, and particulars are given.

In Bailly vs. Robles, 4 N. S. 362, it was held that " facts communicated by a client to the attorney, in his *professional character*, cannot be given in evidence by the latter, although he does not receive a fee."   2 Ann. 923, Succession of Harkins.

In 11 Wheaton 280, Chiroc vs. Reinicker, the Supreme Court said : " The privilege, indeed, is *not that of the attorney, but of the client,* and it is indispensable for the purposes of private justice.   Whatever facts, therefore, are communicated by a client to counsel, solely on account of that relation, such persons are not at liberty, even if they wish, to disclose them, and the *law holds such testimony incompetent.*"

In 94 U. S. 457, Continental Life Insurance Company vs. Schafer, the Supreme Court say :  " Within the scope of the professional employment of an attorney at law, the communications made to him are privileged (by his client), and without the consent of the latter, he should neither be permitted nor required by the Courts of the United States to testify concerning them."

In 15 La. 88, Hart vs. Thompson, our predecessors held :  " We cannot admit the distinction pressed upon our attention, by appellant's counsel, between the case when a party *continues* to be the client of the attorney and that when he has *ceased* to be his client, at the time the attorney is called upon to testify.  *  *  *  Nor do we understand why the courts should feel themselves authorized to *supply the consent of a client who has died without giving it.*"

We are, therefore, of the opinion that his evidence was incompetent and should have been excluded.

VI.

The evidence satisfactorily establishes the following facts, viz:

That long prior to 1878 Henry Ross and L. B. Cain had many and large financial transactions, and that the former occupied for many years a seat in the office of the latter.

That David Roos and Julius Meyer resided in the vicinity of Opelousas and dealt largely in this city, annually shipping to their factors large quantities of cotton for sale.

That they were men of reputed means, and had, during the years 1875 and 1876, loaned L. B. Cain large sums of money through Henry Roos, who acted as their agent, for which Cain had, from time to time, executed his due bills and promissory notes in their favor.

That at the date of the transaction complained of, Cain was indebted to these appellants near $70,000.

That immediately after the execution of the two mortgages H. Roos had in his *possession* and under his control a number of the notes secured thereby.

That Mr. Leveque, who was bookkeeper of the commercial house of Marks Bros. & Co., of which Cain was a member, had frequently seen these notes in his possession.

That Mr. Kennedy, Cain's private secretary, was in possession of a number of facts, which he detailed, corroborative of Roos' possession of them as security for his claims.

That Roos was in possession, since the death of Cain, and produced on the trial and filed in evidence, all the notes he claimed to control for himself and his associates.

That the executors of Cain do not set up any claim to them; but, on the contrary, affirm appellant's title to them.

That only a small part of their large demands were subsequently paid by Cain.

That the notes and obligations of Cain which appellants held were *not* cancelled and surrendered upon the execution of mortgages and the delivery of the notes to Henry Roos.

That J. C. Morris, Canal Bank and Germania Bank also retained all of Cain's obligations and treated and considered the mortgage notes as only collateral security therefor.

That, notwithstanding the total acceptances of Cain for Alcus, Scherck & Auty, was reckoned at $120,000, only the $20,000 presented by the Canal Bank, and represented by J. C. Morris, figures in this suit, and they are the only ones existing, so far as the record informs us.

That, if Cain was in a state of insolvency when these mortgages were executed it was unknown to any other than himself, for he was reported to be worth $250,000, and continued to be president of the Germania National Bank for two years thereafter.

His paper never went to protest during his lifetime, and the inventory of the property of his estate shows that he possessed *at his death'* on April 4, 1881, values worth $100,000 in *excess* of the value of the property mortgaged.

That there is no other claimant of the notes held by the appellants.

That two or three witnesses swear, of their *personal knowledge*, that Cain executed the two acts of mortgage to secure his indebtedness to appellants.

There are, in connection with these established facts, several circumstances that point directly to appellants' possession of these notes as surety. One of them is, that on January 16, 1880, Cain resigned the presidency of the Germania National Bank. In the early part of that year Cain was much troubled about a debt he owed Lehman, Abraham & Co., of this city. They threatened *to protest* his paper if the debt was not arranged. Both Kennedy and Leveque testify to his great anxiety about it. Now, if in point of fact appellants did not hold the mortgage notes as security for their claims against Cain, why did not Cain employ some of them as security with these pressing creditors? Because Roos held, amongst others, the notes 14 and 18 and C and D, having a face value of $20,000, and they did not fall due until February 25th and 28th, 1880. The proof on this point is that " a year or so before his death, Cain had trouble with Lehman, Abraham & Co." He died on April 4, 1881.

Another circumstance is that some months after the execution of these mortgages Henry Roos loaned Cain $4,000 in cash. Why would he have done that if he had not been amply secured ?

There is still a more potent one, and that is that Cain was indebted to appellants, anterior to and at the date of these mortgages, near $70,000, and the judgment appealed from affirms it, in addition to the large sums he owed to other persons to the knowledge of Roos; and the improbability there was of his accepting a mortgage of $140,000, on his most valuable properties, in favor of the *creditors of Alcus, Scherck & Auty, to the prejudice and exclusion of his own* and those of his associates.

Conceding that it was the *avowed* purpose of Cain to protect his acceptances from protest—and we rather think it was—with what propriety, or even *show* of success could he have approached Roos on

the subject, *unless he had promised him a share of the benefits to be derived therefrom?*

The evidence satisfies us that the charge of simulation is not made out.

## VII.

It appears, from the evidence, that all parties—Morris, Canal Bank, Germania Bank and appellants—*retain* all of Cain's notes, due bills and other obligations, and hold his mortgage notes as security therefor.

In some instances the indebtedness was *increased* after the execution and delivery of those notes. In one instance two of those notes were pledged by Cain for an *overdraft* of $10,000 and for *any future overdraft* that might occur thereafter. In one case a portion of those notes were employed by one of Cain's creditors as a security, and upon his debt being partially paid, they were returned, and by Cain reissued before maturity.

These circumstances do not affect their validity and do not evidence simulation.

The Code authorizes a mortgage to be given for an obligation which has not yet risen into existence. R. C. C. 3292.

But in this case the mortgage can only be enforced in so far as the future obligation shall have been created. R. C. C. 3293. " The fulfillment of the promise, however, shall impart a retrospective effect to the time of the contract."

In D'Meza vs. Generes, 22 Ann. 285, the Court held that " a mortgage may be given to secure a debt that has no legal existence at its date, as well as to secure a *loan* that is to be obtained in the future, on the faith of its security, * * * and that the loan having been made on the faith of the security of the mortgage, it was binding on the property mortgaged to the *extent* of the amount loaned from the date of the loan."

In Pickersgill vs. Brown, 7 Ann. 297, the Court held: " It is *not* essential in such a mortgage, even in respect to third persons, that it should *express upon its face* that it was executed to secure *future* debts. It may be described as security for existing debts, and yet *used to protect those which*, in contemplation of the parties, *were to be created at a future time.*" 8 N. S. 529 ; 10 R. 383 ; 16 La. 371, Brander vs. Bowman *et al.;* 12 Ann. 432, Wolf vs. Wolf.

In Matthews vs. Rutherford, 7 Ann. 225, it was held that under the law-merchant, the only difference between an *absolute* holder for value

and the party who takes the note as *collateral* security, is that the former may recover *in full*, while the latter can only recover to the *extent of his debt*. 21 Ann. 5, Succession of Dolhonde.

In 25 Ann. 363, Merchants' Mutual Ins. Co. vs. Jameson, it was held that when a mortgagor offers a series of mortgage notes as collateral security, and part are accepted and part declined, the latter may be placed *elsewhere* as security. 27 Ann. 561, Gardner vs. Maxwell.

In referring to those cases this Court said in Schepp vs. Smith, that " whatever perplexities once existed touching the power of the mortgagor to dispose, himself, of his notes, secured by mortgage in favor of a *nominal* mortgagee, have been effectually dispelled " by the rulings therein.

" These last two cases theoretically favor the recognition of the existence and validity of the mortgage, in favor of a third and innocent holder, *when the note is reissued by the maker before maturity.*" 35 Ann. 5.

This doctrine meets our approval. There is nothing in such a transaction to impair the merchantable value of a security negotiable by delivery.

## VIII.

We will next consider the act of preference executed by Henry Roos on the 9th of March, 1878. This act was executed at the instance and request of John C. Morris, and for his benefit and that of the Canal Bank. The act was passed before Theodore Guyol, notary, and same was identified with the notes by his official paraph indorsed on the face of the notes—not only the eleven held by Morris and the Canal Bank, but the eight then held by Henry Roos for *his own* account. Those, as we have heretofore ascertained, were numbered 1, 2, 3, 4, 5, 6, 7 and 10, and maturing in one year from date.

*Of these* the Germania Bank acquired, as collateral security for Cain's indebtedness, notes numbered 1, 2, 3 and 4. The bank claims that its acquisition was prior to their maturity, but Henry Roos contends that it was after they had become due, and had been paid. On this subject there is a serious conflict of testimony which we need not examine, as we are satisfied that the mortgage notes were only intended for use as *collateral* security, and did not evidence any *primary* obligation. But the Germania Bank contends that it had no notice or knowledge of the existence, or contents of the act of preference, when it acquired them, and that it is protected by the law-merchant, as a good faith holder before maturity, for value; and that the notary's paraph was insufficient to put it upon inquiry.

Counsel for the bank cite, in support of that theory, 11 Ann. 664; 8 Ann. 457, and 35 Ann. 3, Schepp vs. Smith.

The first two cases are only to the effect that the notary's paraph identifying the note with a mortgage securing its payment, does not *impair its negotiability*. But in *Schepp vs. Smith* it was held sufficient to put a purchaser on his guard.

The Court say: "Had the *note been paraphed* to identify it with the act (of pledge) the defendant might, perhaps, have charged that the pledgee was thereby *put on his guard*—notified of the declaration contained in the act of sale, and bound thereby. etc. * * * What he was bound to know was what he could have known, and, in point of fact, did know."

Treating of the effect of memoranda written on bills and notes, Mr. Daniels says: Questions have frequently arisen as to whether they were to be regarded as incorporated into the instrument or not.

Quoting: "It seems that the purport of the instrument is not only to be collected from 'the four corners,' but from 'the eight corners,' a memorandum on the back, affecting its operation, being regarded the same as if written on its face." Daniels' Nego. Ins., sec. 151.

Again: "It is competent for either party, by parol testimony, to show the *time*, the person by whom, and the circumstances under which a memorandum upon a bill or note was made.

"If made--and it will be presumed that it was so made—contemporaneously with the execution of the instrument, and is a component part thereof, it will be given full effect as above stated; if made *after* its execution, and with the *consent of all parties*, it will *modify and control its operation;* and if made by a stranger, without the consent of any party, it will be a *spoliation*, and disregarded; while, if made by the *holder without the consent of the parties*, it will vitiate and avoid it, being a material *alteration*." *Ibid*, secs. 154, 769.

The proof shows that Morris was the holder for himself and the Canal Bank of eleven of the *first series* of notes, and Henry Roos of eight. Morris demanded of *Cain better security*.

Cain obtained Roos' consent to yield the preference that was granted.

Subsequently, the Germania Bank acquired *from Cain* four of the *subordinated* notes—for the argument, it may be conceded before maturity—as collateral security. The vice president and cashier testify that the bank obtained them from Henry Roos, as agent of *Cain*, *and for Cain's account*.

The notes themselves are indorsed: "*Pay to the Germania Bank*," and signed, "*L. B. Cain*."

*All the other notes* are indorsed *in blank.* This is proof *undeniable* that the Germania Bank was not a *purchaser* from a payee, or *other third person,* before matuity, for a valuable consideration. Those witnesses testify, and Cain's account shows, that the bank held this paper as collateral security only. When the paper was received by the bank, it was impressed with the paraph, identifying it with the act of preference by the maker, from whom it was received. Those notes, thus impressed, had only the value, in the hands of the Germania Bank; of second mortgage paper.

The paraph of the notary was neither an alteration nor spoliation.

The bank denies that these notes were ever reïssued, as Roos contends. This only strengthens the conclusion that the notes were by the maker postponed, in their right to payment, to those held by Morris and Canal Bank. Cain, the maker, *before* the issuance of the notes, had the right to alter them if he chose. If they had once been issued to Roos, he and Cain, maker and payee, had that right. If the notes were subsequently returned by Roos to Cain, and by him reïssued, before maturity, to the Germania Bank, the alteration made *by Roos and Cain* was still impressed upon them.

But, if the Germania Bank is to be viewed in the light of a *purchaser,* its position is not improved.

"It is quite clear and well settled that the *purchaser* need not have notice of the *particular* fraud, or equity, or illegality, in order to be effected by it. It is sufficient that there be notice, *actual* or *constructive,* that there is *some* fraud, equity, or illegality, affecting the *original* parties." *Ibid,* sec. 799.

The fact that the act of preference was not recorded until long after the bank's acquisition of the notes can make no difference. Had they dealt with the *property* mortgaged instead of the notes, quite a different rule would have obtained.

"Parties negotiating for negotiable instruments are not bound to take notice of *public records,* and litigation, *which would affect them with notice, were they dealing with the subject-matter.*

"And, therefore, when there is *nothing* on the face of the bill or note *giving notice of any defects,* the fact that a deed of trust securing its payment contains recitals which show that equities or offsets exist between the *original* parties, does *not* weaken the position of a *bona fide* holder without notice." *Ibid,* sec 880.

The paraph on the note was quite sufficient to put a purchaser upon inquiry. It does not, of itself, impair its *negotiability;* but it does impair its *value as a security.* In the instant case all the notes

were held as collateral security. It was the mortgage that gave them value. The act of preference was created in order to furnish Morris and the Canal Bank with "*better security*," to which Cain, the maker, consented.

We are of the opinion that the act of preference was a valid and binding agreement, and that the notes postponed thereby cannot be allowed to come in competition with others mentioned as entitled to priority, nor with those that are not mentioned therein. They must be paid, and in full.

IX.

The remaining question for determination is, whether Moses Lobe & Co. are liable for *interest* on the balance of the purchase price remaining in their hands.

The judgment of the lower court relieved them, as well as M. Frank, from paying interest. This was, doubtless, upon the theory that the appearance of Moses Lobe & Co. represented both.

In their intervention, all parties thought to have an interest in the distribution of this fund were cited into court to contest, contradictorily with each other, their respective rights, and they prayed the court to allow them to make a deposit of the purchase price in their hands, and that the fund be decreed to be paid to *such party or parties as shall effectually disburden the property purchased of its mortgages and free them from all liability*, so that the property should pass to them *unincumbered*, and they be relieved *from paying interest*.

Thereupon the court granted an *ex parte* order, directing all persons interested to be summoned by notice published in a newspaper, and that the funds be deposited in the State National Bank on or before the 1st of October, 1881, or that the parties notified show cause to the contrary.

*The money was never deposited in court or in bank.* Intervenors announced their readiness to make the deposit, and that it should be paid to whomsoever the court should decree entitled to it.

It was admitted on the trial that intervenors "tendered the court, for deposit, the total amount of the adjudication and asked the court to issue an order upon all parties to show cause why it should not be deposited in the State National Bank, or at any other place they should be willing it should be deposited."

The contention of the Germania Bank and appellants was that the fund should be deposited with the executors of Cain for distribution.

There was some evidence adduced by the intervenors to the effect that they had in bank cash deposits *sufficient* to have enabled them to

have checked for an amount equal to the surplus of the proceeds in their hands. But the evidence also shows that they did not keep in bank a *special fund on deposit* for the purpose of paying the purchase price; and, notwithstanding they had a *surplus to their credit in bank,* they were checking on the bank. from time to time, for various sums. That this money has been kept in their own name to the credit of the *general* account, and a sufficient amount at all times retained there to pay the sum due to whomsoever the court should order it paid.

Was this such a deposit or offer to deposit the price of adjudication as contemplated by the code, whereby the purchasers might exonerate themselves from paying *interest?*

In this case we are dealing with a *concursus* created by intervenors for their own protection and benefit.

When this cause was under previous consideration their right to create it was determined. 34 Ann. 644; 35 Ann. 759.

Their manifest purpose, in its creation, was to compel the creditors of Cain to contradictorily establish their rights, and to receive *payment* accordingly, with a view of disencumbering *their property.* Their right to make a deposit was not then a controversy in the case, and was not decided.

The appellants rest their claim for interest on R. C. C. 2550, 2559.

Quoting the former: "The buyer owes *interest* on the *price* of the sale until the payment of the capital, in the three following cases:

\*        \*        \*        \*        \*        \*        \*        \*        \*

"2.    If the thing sold *produces fruits,* or any other income.

"3.    From the date of the sale, when the price is then due."

Quoting the latter: "The *purchaser* may also require the deposit, to *relieve himself from the payment of interest.*"

All debts bear interest at the rate of five per cent per annum from the date they become due, unless otherwise stipulated. R. S. sec. 1883; R. C. C. 1938; 33 Ann. 582; 7 N. S. 437; 4 Ann. 6; 12 Ann. 116.

Like rules obtain with regard to judicial public auction sales, and private sales. R. C. C. 2617, 2608.

These articles have been the subject of repeated adjudications. 19 La. 94, Ball vs. LeBreton; 7 R. 175, Erwin vs. Greene; 9 R. 424, Ferrand vs. Claiborne.

In 15 Ann. 256. Brothers. syndic, vs. Cronan. the Court said. "The vendee, in order to relieve himself from the payment of *interest,* is required to make a *deposit* of the price."

In that case suit was brought to have the adjudication declared null. The Court decided that he had the right to "suspend *payment* of the

price" until security was furnished, but that did not relieve him from paying interest. R. C. C. 2557, 2558.

The Court puts it thus pointedly: "The fact that the syndic in the suit against McDonogh sought to have the adjudication declared null, did not authorize the plaintiff to keep *both the price and the property,*" etc.

Quite a parallel case is found in 5 Ann. 313, Scott vs. Featherstone, in which the Court said: "The sale under the concurrent mortgage did not extinguish the *other mortgages created in the same act and at the same time.* No proceedings had been taken on those other mortgages, and the sheriff had no right to receive the amount due on them, under the writ he held.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

"The portion coming to the *other* mortgage creditors would, in that case, remain in the hands of the purchaser, *subject to their call,* and secured by their mortgage.

＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊

"Collier, in whose place they stand, was a stake-holder to the amount remaining in his hands, after satisfying the executions under which he purchased.       ＊       ＊       ＊

"For that *interest,* as well as the principal, a privilege existed on the property at the time of the judicial sale, and *it continued to run against Collier afterwards, upon that portion of the price which remained in his hands.*

"*To that interest the plaintiffs are entitled.*"

In 31 Ann. 87, Bacas vs. Hernandez, the Court said: "He is not only permitted to retain, but he is *required* to retain in his hands, the amount of the liens in advance of that of the seizing creditor, and the day to which the *interest* upon them is to be calculated for retention, has been fixed." 18 Ann. 65, Quertier vs. Succession of Hille; 25 Ann. 345, Henderson vs. Merchants' Mutual Insurance Co.; 7 R. 398, Fortier vs. Slidell.

In Yateman, Woods & Co. vs. Erwin, 14 Ann. 145, the Court said:

"But the property was of a kind which produced fruits, and it would be unjust that plaintiffs should retain the price in their hands, and *not pay the interest,* while his judgment, to pay which the property was sold, was bearing interest.

"It appears to us, that the article of the Code of Practice which authorizes the purchaser to retain in his hands the amount of the special mortgages and privileges, implies that the purchaser, himself, like the property he has bought, must become responsible, and bound for the *interest which may accumulate on such mortgages after the sale.*

"Otherwise it would be to the advantage of the purchaser to delay the payment of the portion of the price left in his hands as long as pos-sible, and the debtor would be deprived of his property *while interest would be constantly accumulating against him*," etc.

The purchasers have been in the possession and enjoyment of the valuable property they purchased on the 18th of June, 1881, and yet they have retained in their hands about $90,000 of the price to the credit of their *general account in bank ever since*, less the amounts dis-bursed, upon orders of court, in the executory proceedings.     To relieve them, under all the circumstances herein related, from the payment of *legal interest*, would be gross injustice to Cain's succession and his creditors.

## X.

The appellants are the only parties entitled to the benefits of this decree against the purchasers for interest, and only the holders of notes of the *first* series of twenty-four are entitled to participate in the distribution of the proceeds of the sale of the property made June 18, 1881.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be and is hereby amended in the following particulars, to-wit :

1.   So as to recognize the right of David Roos, as the holder of notes numbered 14 and 18, to participate in the distribution of the proceeds of sale concurrently with the New Orleans Canal and Bank-ing Company.

2.   So as to allow Julius Meyer, as the holder of notes numbered 8 and 9, to participate therein concurrently with the New Orleans Canal and Banking Company.

3.   So as to allow the Germania National Bank, holding note No. 19, to participate therein concurrently with the New Orleans Canal and Banking Company.

4.   So as to allow Henry Roos, holding notes numbered 5, 6, 7 and 10, and the Germania National Bank, holding notes numbered 1, 2, 3 and 4, to participate ratably and equally in whatever surplus shall remain after preceding payments have been made.

5.   So as to require of Moses Lobe & Co. to pay five per cent per annum interest on the sum of $67,000, the amount of price of the property purchased by them, under executory proceedings, from the 18th of June, 1881, until paid, subject to proper credits for sums by them expended under orders of court.

6.   So as to require of M. Frank to pay like interest on the sum of

$27,550, the amount of the piece of property purchased by him from same date, until paid, subject to proper credits for sums expended under orders of court.

By rejecting the demands of Wiltz, administrator, against the appellants for the annulment and revocation of the two acts of mortgage as simulated *pro tanto*, and by avoiding that part of the decree of the court *a qua* requiring the appellants to surrender their notes for cancellation.

By requiring the Recorder of Mortgages to cancel and erase the said conventional mortgage executed by L. B. Cain on the 25th of February, 1878, and the *legal* mortgage resulting from the registry of the marriage contract between L. B. and Caroline Cain, in so far as it affects their property, when Moses Lobe & Co. and M. Frank shall have complied with the terms of this decree.

It is further ordered, adjudged and decreed that, in all other respects, the judgment appealed from be affirmed, with all costs of both courts to be taxed against P. S. Wiltz, administrator, M. Frank, Moses Lobe & Co. and Germania Bank.

Judgment amended and affirmed.

---

## ON APPLICATION FOR REHEARING.

POCHÉ, J.   On consideration of the numerous applications for rehearing in this cause, we have discovered several errors which have crept in our review of the very complicated and almost innumerable issues presented in the multifarious pleadings contained in this record. Hence, we have concluded to reopen the case in order to make necessary corrections.

I.

The first complaint which attracts our attention emanates from Moses Lobe & Co., and is levelled at that part of our opinion which holds-them liable for legal interest on the amount of their purchase from the date thereof.

In his brief, their counsel is clamorous in his description, and he grows literally censorious in his complaint of the manifest errors which, in his opinion, we have committed in that connection.

His great reliance to support his assertion that we have done injustice to his clients, is on our opinion in the case bearing the title of Morris vs. Executors of Cain, reported in the 34th of our Annuals, p. 657.

He argues that, on the strength and under the guidance of our adju-

47

dication and of our utterances in that case, he advised his clients of their right to suspend the payment of the price of their purchase, and assured them that they could not be held liable for interests on the amount of their debt. Hence, he concludes, with great assurance, that we must have erred in our present case, or in the previous opinion; that it is now too late for us to recede from our previous utterances, and that, therefore, we have no alternative but to recant our conclusions in the present case, or otherwise we might be charged with glaring judicial inconsistency.

A careful reading of the opinion in the 34th Annual will satisfy any impartial mind that the zeal of counsel has clouded his judgment.

A reference to that case shows that the two points discussed and disposed of therein were as stated in the opinion:

1. "Are the defendants (the executors) entitled to receive the proceeds of sale realized in this suit, to distribute them by an account in the succession of the deceased, which they represent?"

2. "Has a purchaser of real estate at the judicial sale made in this case the right to proceed, as he has done, with a view to clear the property acquired by him from the encumbrances which burden it?"

The issue was presented in a proceeding styled an intervention, instituted by Lobe & Co., in which it was proposed to bring all parties in interest into court by means of a notice published in a public journal, under an *ex parte* order of the district judge.

Now, while the Court recognized the right of a purchaser situated like Lobe & Co. to seek by some legal proceeding to clear the encumbrances which cloud his title, or in the mean time to deposit the amount of his purchase, it concluded that the mode adopted by them and sanctioned by the lower court was not warranted under our laws; it also held that the executors were not entitled to receive and administer the proceeds of the sale, and hence the following decree was entered:

"It is ordered and decreed that the judgment appealed from discharging the rule of the executors for the proceeds of sale be affirmed at the costs of appellants."

"It is further ordered and decreed that the *ex parte* order rendered on the 9th of August, 1881, on the petition of Lobe & Co. filed on that day be annulled and set aside, and that the prayer therein for such *ex parte* order be refused without prejudice to further proceedings on the petition itself, contradictorily with the parties therein asked to be cited, the costs of the appeal from the order, including the costs of the rendition of the order, to be paid by Lobe & Co."

Now, it appears, from the records of this Court, that in furtherance

of that decree, Lobe & Co. then renewed their proceedings in the lower court, where they were met by an exception of no cause of action, and one of improper proceeding. On appeal by them from a judgment maintaining the exceptions, this Court recognized the proceeding as proper, as well as intervenor's cause of action, reversed the judgment appealed from, and remanded the case for further proceedings. 35 Ann. 759, Morris vs. Cain's Executors.

It is clear that the purport and legal effect of those two decisions were to judicially recognize the right of intervenors to seek to clear the encumbrances off their property, and to judicially determine the proper mode of proceeding to that end. No issue was presented involving their right to make a deposit of the purchase price in the instant case, and no decree or mandate affecting such right in the remotest degree was made in either case.

We were, therefore, fully sustained by the record when we made the following statement in our present opinion :

"Their right to make a deposit was not then a controversy in the case and was not decided." Hence, it follows that any argument or assertion to the contrary is unwarranted.

The last judgment above-referred to was rendered in May, 1883, and the record before us fails to disclose any effort on the part of Lobe & Co. to press their asserted right to make a deposit to a trial, and as an independent question, it has not to this day been judicially disposed of.

It is, therefore, perfectly safe to conclude that the argument which seeks to commit this Court to a decision or utterance under which counsel could claim the right to assure his clients that they could not be legally held liable for interests on the amount of their purchase, is absolutely unfounded.

It is thus made clear that intervenors can derive no strength from our own precious utterances in support of their present contention.

A second examination of the authorities on which they rested their claim to be exonerated from the payment of interest on their purchase, and of those on which we rested our conclusions has had the effect of solidly confirming our views on the subject.

The apparent conflict between the decisions which they quote and those which we have followed is easily explained by the consideration that Article 2553 of the present Civil Code, which is quoted in our opinion, was not contained in the Code of 1808, on the provisions of which the decisions of Miles vs. Oden, 8 N. S. 214; Jovellina vs. Minor, 1 La. 72; D'Aquin vs. Coiron, 3 La. 409, which they quote,

were rendered. Hence it follows that the rule was changed, not as a result of a judicial departure from established principles, but as a consequence of a legislative mandate.

Dealing with the subject in the leading case on this question, this Court said : "All these decisions were made with reference to the Code of 1808; the case now before us arose under the existing Louisiana Code, which contains some express provisions on this subject, besides those in the former Code." And the article in question is then referred to as the provision introduced in the new Code by the jurisconsults who prepared the amendments to the Code, and doubtless with the intention of establishing the rule that the purchaser must either deposit the amount of his purchase or pay interest thereon. In that case the opinion settled the rule as follows: "To withhold or suspend payment does not necessarily imply a forfeiture of any part of the debt or of its accessories. The creditor who is unable to give security may require the deposit. He may require it to be made in a bank which pays interest on deposits. If he do not and consents to leave it in the hands of the debtor, the latter becomes a quasi-pledgee, and being at the same time in the enjoyment of the property sold, it would seem should be bound in equity to pay the interest, which is a compensation for fruits, unless he in his turn chooses to relieve himself from the payment of interest by depositing the price." Ball et al. vs. LeBreton et al., 19 La. 149.

This case has been affirmed in every subsequent opinion rendered in causes involving that question. In the instant case it is not contested that Lobe & Co. had the right to suspend payment. It is equally clear that the property bought by them bears fruits; hence, they must pay interests.

But, as contended for by intervenor's counsel, we should have framed our decree so as to conform with the following conclusion in our opinion : " The appellants are the only parties entitled to the benefit of this decree against the purchaser for interest." It follows, therefore, that the extent of the obligation to pay interest is to be measured by the aggregate amount accruing out of the purchase price to the notes held by Julius Meyer and Henry and David Roos.

The complaint of the same counsel of that part of our decree in distributing the costs incurred in the trial below is also well founded and in both these particulars we shall amend our original decree to the relief of Moses Lobe & Co.

## II.

The next application to be considered is that made by counsel for

the Germania Bank, who charge error in our conclusions in favor of Henry Roos. They contend that the record affords no proof of the legal rights of Roos to the ownership and possession of the notes Nos. 5, 6, 7 and 10 of the series of 24 mortgage notes. A second examination of the record on this point leads us to the conclusion that the contention is unfounded, and to adhere to the reasons of our original opinion.

But the bank is entitled to relief on the question of costs. There is error in holding her for a portion of the costs in the lower court, and to that end our amended decree will be particularly in her favor.

### III.

We shall now note the complaint of the present counsel of M. Frank, who is held up as no party to the proceedings and as having been erroneously condemned to pay interest on the amount of his purchase, as well as to costs. His counsel are mistaken in their contention. Although Frank had made no appearance by pleadings or by counsel, he had been legally made a party to the *concursus*. A default had been taken against him in two of the numerous pleadings which were all joined in the consolidated proceedings, and the district judge rendered in his favor precisely the same judgment which was rendered in favor of M. Lobe & Co., and, like them, he is now an appellee before this Court, and equally within the scope of any judgment which may be rendered in favor of the appellants in the cause.

When the district court decreed that he was entitled on payment of the amount of his bid *without interest*, to a full cancellation of the mortgage and other encumbrances which affected the property which he purchased, no one was heard to complain in his behalf that he was not involved in the contest.

Our conclusions as to him are correct and they will remain undisturbed.

### IV.

We are favorably impressed with the complaint of counsel for the Canal Bank from that part of our opinion which purports to give legal effect to the preference recognized as binding in our opinion, granted by Henry Roos as the holder of eight of the mortgage notes to the eleven notes of the same series held by J. C. Morris and by the Canal Bank.

Under a correct construction of that act it is clear that the *status* of the notes 8, 9, 14, 18 and 19, which were not then held by either of the contracting parties, remains as unaffected as if the act of preference

had never been executed. It follows therefore that, with the act, as without it, the holder of each of those five notes is entitled to participate in one-twenty-fourth of the whole fund, for the reason that he is neither preferred nor postponed to the holders of any of the other notes of the series.                                                     •

Now the practical result of our decree is to advance the holders of these five notes, *quoad* the eight postponed notes, to the same rank held by Morris and the Canal Bank, and thus to make them participate each for one-sixteenth instead of one-twenty-fourth of the proceeds of the sale, and therein consists the error which we shall correct in our new decree.

In order to facilitate a proper execution of the judgment, we recast the decree in its entirety; although the corrections are intended to affect certain portions only.

It is therefore ordered that our previous decree be annulled and set aside, and that the following decree be rendered in its stead :

It is therefore ordered, adjudged and decreed that the judgment appealed from be amended in the following particulars :

1.  That said judgment, in so far as it exonerates Moses Lobe & Co. and M. Frank from the payment of interest on their purchase, as it denies the ownership of appellants to the mortgage notes which they claim to hold, and in so far as it maintains the action of Wiltz, public administrator, for the simulation *pro tanto* of the act of mortgage under which appellants declare, be annulled and avoided. It is further decreed

2.  That five-twenty-fourths of the principal of the fund realized be set apart for the benefit of the Germania Bank, as holder of note 19 for one-twenty-fourth ; of David Roos, as holder of notes 14 and 18, for two-twenty-fourths ; and Julius Meyer, as holder of notes 8 and 9, for two-twenty-fourths.

3.  That out of the residue, nineteen-twenty-fourths, J. C. Morris and the Canal Bank, as holders of the notes 11, 12, 13, 15, 16, 17, 20, 21, 22, 23 and 24, be paid in full and by preference out of the amount accruing to and remaining over to the credit of Henry Roos, as holder of notes 5, 6, 7 and 10 ; and of the Germania Bank as holder of the notes 1, 2, 3 and 4.

4.  That Moses Lobe & Co. and M. Frank be condemned to pay interest at the rate of five per cent per annum from June 18, 1881, on the balance remaining due by them respectively on the respective amounts of their purchases, to the extent of the aggregate amount of the notes held by appellants as follows : of notes 8 and 9 held by

Julius Meyer, of notes 14 and 18 held by David Roos, and of notes 5, 6, 7 and 10 held by Henry Roos.

. 5. That the recorder of mortgages be ordered and required to cancel and erase the said conventional mortgage executed by L. B. Cain on February 25, 1878, and the legal mortgage resulting from the registry of the marriage contract between L. B. Cain and Caroline Cain, in so far as it affects their property, as soon as Moses Lobe & Co. and M. Frank shall have complied with the terms of this decree.

It is further ordered that in all other respects and particulars the judgment appealed from be affirmed and made the judgment of this Court.

It is further ordered that all costs below incurred in the action of Wiltz, administrator, as against the validity of the mortgage and the claims of appellants, be taxed against said public administrator, and all others costs below equally between Moses Lobe & Co. and M. Frank; and that the costs of appeal be taxed equally against P. S. Wiltz, Jr., public administrator, M. Lobe & Co., M. Frank, and the Germania Bank.