POLANCO, DEMANDANTE Y APELADO, *v.* GOFFINET ET AL., DEMANDADOS Y APELANTES.

APELACIÓN procedente de la Corte de Distrito de Humacao en pleito sobre nulidad de procedimiento ejecutivo hipotecario.

No. 2193.—Resuelto en febrero 25, 1921.

NULIDAD DE PROCEDIMIENTO EJECUTIVO HIPOTECARIO — HIPOTECA GARANTIZANDO CRÉDITO REFACCIONARIO—CERTEZA, EXIGIBILIDAD Y CUANTÍA LÍQUIDA DEL CRÉDITO HIPOTECARIO RECLAMADO.—Alegándose en el escrito inicial del procedimiento sumario instado para ejecutar hipoteca constituída para garantizar un préstamo refaccionario que el saldo reclamado había sido previamente liquidado de conformidad con el deudor, cuando tal hecho es un elemento esencial de la base en que descansa la institución y mantenimiento de la acción, y habiéndose probado en el juicio declarativo instado por el ejecutado reclamando daños y perjuicios que tal alegación era falsa, el procedimiento ejecutivo es nulo y el ejecutante está obligado a indemnizar los daños y perjuicios que sufra el ejecutado como consecuencia del procedimiento.

ID.—DAÑOS Y PERJUICIOS CAUSADOS AL DEUDOR INDEBIDAMENTE EJECUTADO.—La pérdida sufrida por un deudor hipotecario ejecutado durante todo el tiempo que estuvo privado de la posesión de la finca es el resultado directo del hecho injustificado y malicioso de acudir ilegalmente al procedimiento sumario ejecutivo, siendo al mismo tiempo un método razonable de estimar los daños y perjuicios causados.

ID.—PARTES DEMANDADAS.—Cuando un acreedor ejecutante que es demandado por el deudor en reclamación de daños y perjuicios con motivo de la ejecución, quiere traspasar su responsabilidad a los compradores de la propiedad ejecutada, debe solicitar que éstos sean incluídos como demandados a fin de que pueda fijarse su responsabilidad después de ser oídos y vencidos.

Los hechos están expresados en la opinión.

Abogados del apelado: *Sres. Sarmiento, Rodríguez Serra y Puig.*

Abogado de los apelantes: *Sr. H. G. Molina.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

En abril 11 y julio 17 de 1912, el demandante José Jacinto Nicolás Polanco convino con la "Central Santa Juana," de Caguas, en sembrar para ser entregadas a dicha central durante las zafras de 1913 a 1917 inclusives, 250 cuerdas de caña y para entregar en cada una de las zafras de 1914 y 1915, cien cuerdas. De acuerdo con la liquidación de cuentas, por virtud de un contrato sobre anticipos refaccionarios que también lleva fecha de abril 11, 1912, en marzo 17, 1914, Polanco ya había recibido de y debía a August y Constance Goffinet la suma de $15,725.55. En la escritura de fecha marzo 27, 1914, después de consignarse estos hechos, se procede a abrir una nueva cuenta con un crédito adicional de $14,274.45, que forma un total de $30,000, para garantizar el pago del cual, con sus intereses al diez por ciento anual y un crédito adicional de $500 para costas, gastos y honorarios de abogado, el demandante Polanco constituyó a favor de sus referidos acreedores una tercera hipoteca sobre las fincas sembradas o que habían de sembrarse, como queda expresado y por el término y bajo las condiciones siguientes:

"(*a*) La cantidad de dinero restante de los treinta mil dollars, descontando los quince mil setecientos veinte y cinco dollars cincuenta y cinco centavos, o sean catorce mil doscientos setenta y cuatro dollars cuarenta y cinco centavos, quedan en poder de los acreedores hipotecarios Barones August y Constant Goffinet, para ir tomando a cuenta corriente el deudor señor Polanco ese dinero, con destino a las plantaciones, de cañas, en la forma que expresará. Todo el azúcar que se obtenga de las cañas a moler en la actual zafra, se aplicará totalmente al reembolso de su cuenta, sin ninguna limitación, traspasándose el saldo que resulte al terminar la zafra corriente, como un anticipo aplicado a la zafra próxima de mil novecientos quince.

"(*b*) Como el señor Polanco está obligado a entregar todas las cañas de esta cosecha a la Central Santa Juana, los hermanos Barones

August y Constant Goffinet convienen en facilitarle a dicho señor Polanco, como ayuda o compesación un dollar por cada tonelada de caña de azúcar que entregue, liquidándosele el dinero a percibir por ese concepto, semanalmente; y el montante que se hubiere anticipado con motivo del corte y arrimo para su molienda, durante la actual zafra, correrá en aumento del saldo de mil novecientos catorce, para su completo pago en el mil novecientos quince.

"(c) Los hermanos Goffinet seguirán haciendo, con cargo a la cantidad convenida en este contrato de hipoteca, los anticipos necesarios para el corte y arrimo, siembra, cultivo y mejoramiento de las cañas desde mil novecientos quince en adelante, de acuerdo con los contratos que tiene celebrados y vigentes el señor Polanco con la Sociedad Anónima *des Sucreries de Saint Jean*, bajo la estimación de cincuenta dollars por cuerda de plantilla, y veinte y cinco dollars por cuerda de tocón; pero siendo convenido y pactado que esos anticipos se servirán a medida que el señor Polanco vaya realizando sus trabajos agrícolas y a juicio del Director de la Central Santa Juana, las plantaciones en cultivo justifiquen y garanticen la cantidad exigida, y cuando tenga lugar el corte y arrimo de las predichas cañas, a los vagones para su conducción a las oficinas de molienda de la Central.

"(d) El dinero que el señor Polanco esté adeudando con arreglo a la oportuna liquidación al finalizar la zafra de mil novecientos quince, por los anticipos ordinarios efectuados durante la misma, o sea lo que haya percibido para el cultivo de las cañas, lo satisfará con todo el azúcar que las expresadas cañas produzcan en la zafra de mil novecientos quince, quedando los hermanos Goffinet, o quienes sus derechos y acciones representen en Puerto Rico, expresamente facultades, sin reserva alguna, para vender por cuenta del señor Polanco dicho producto azucarero; y el exceso eventual que entonces resulte vendrá en reembolso del saldo de mil novecientos catorce, compuesto del traspaso y del dinero anticipado por el corte y arrimo del mismo.

"(e) El señor Polanco reembolsará en la misma forma los dineros debidos por esos mismos conceptos en las zafras subsiguientes; pero es entendido que indispensablemente, a más tardar el treinta y uno de julio de mil novecientos diez y siete, saldará totalmente a dichos acreedores señores hermanos Goffinet la integridad de su deuda, con más el interés convenido.

"(*f*) Si durante cualquier zafra, las partes, puestas de acuerdo, resolvieren dejar algunas cañas plantadas, sin moler, por no tener la condición necesaria para la molienda, dichas cañas en ese caso se valorarán, y el importe estimado de los anticipos recibidos sobre dichas cañas por el señor Polanco, se traspasará al año siguiente, para reembolsarlo durante la zafra en que se molieren dichas cañas.

"(*g*) Si al terminar la zafra de mil novecientos quince, o la de mil novecientos diez y seis, o en cualquiera de ellas, el deudor señor Polanco no hubiese reembolsado el montante de los anticipos ordinarios, o sea los causados por razón de siembra, cultivo, arrimo y corte, por esa circunstancia se entenderá vencida la presente obligación hipotecaria, pudiendo los acreedores hermanos Goffinet, por su representación en esta isla, ejercitar el cobro de su crédito total y a la ejecución de la hipoteca, por el procedimiento sumario que establece la Ley Hipotecaria y su Reglamento."

En agosto 24, 1917, se establecieron mediante petición procedimientos sumarios para ejecutar esta hipoteca en los que se alegaba entre otras cosas—

"Que el día primero de los corrientes, los demandantes ejecutantes de conformidad con el ejecutado, liquidaron la cuenta de refacción garantizada por la hipoteca antes referida, resultando que en la citada fecha primero de los corrientes arrojaba un saldo a favor de los demandantes de diez y ocho mil doscientos ochenta y seis dollars cuarenta y seis centavos."

En esta alegación también se ofrecía en la forma acostumbrada, indemnizar—

"Cuantos daños y perjuicios se irroguen al deudor o terceros interesados, por malicia o negligencia en la fiel exposición de los hechos relacionados."

En agosto 27, 1917, solicitó Polanco que la corte dejara sin efecto la orden dictada el 24 de ese mes ordenando el pago de la suma que los acreedores hipotecarios alegaban se debía, apercibidos de ser vendida la finca hipotecada en pública subasta caso de no verificarse el pago, por los siguientes fundamentos:

"I. El escrito inicial del procedimiento hipotecario promovido por los hermanos August y Constant Goffinet, demandantes ejecu-tantes en este caso, no se ajusta a los requisitos señalados en el artículo 169 del Reglamento para la aplicación de la Ley Hipotecaria vigente en Puerto Rico.

"Primero: Porque no se acompaña el título del crédito reclamado.

"Segundo: Porque en el escrito inicial se omite señalar categóri-camente las cantidades ciertas cobradas en concepto de intereses o a cuenta del capital de la deuda.

"Tercero: Porque no consta en documento auténtico cuál sea el importe exacto líquido y exigible de la deuda.

"II. Alega además el demandado ejecutado, que en el referido escrito inicial los demandantes han expuesto falsa y maliciosamente en el párrafo tercero, que el día primero de los corrientes, los de-mandantes de conformidad con el ejecutado liquidaron la cuenta de refacción garantizada por la hipoteca. Tal alegación de los deman-dantes es absolutamente falsa y sólo ha podido hacerse con ánimo de inducir a la corte a dictar la orden de requerimiento de pago, cuya reconsideración el demandado solicita."

Los acreedores hipotecarios impugnaron esta moción por el fundamento, entre otros—

"Que el procedimiento ejecutivo hipotecario no puede suspen-derse sino por los motivos taxativamente mencionados en el artículo 175 del Reglamento de la Ley Hipotecaria."

La razón que realmente informa la orden que niega la moción es la contenida en los siguientes párrafos:

"Si esta corte reconsiderase el auto de requerimiento librado en este caso, y resolviese que por los motivos alegados por el ejecutado no debe despacharse ejecución, equivaldría a resolver que es nula la orden de requerimiento. Y el artículo 175 del Reglamento Hipote-cario que hemos transcrito, establece expresamente: 'que todas las reclamaciones que versen sobre nulidad del título o *de las actuaciones,* se ventilarán en el juicio plenario que corresponda, sin producir nunca el efecto de suspender ni entorpecer el procedimiento ejecutivo.'

"El deudor ejecutado no queda sin protección en virtud de este precepto. Sus intereses y los del acreedor están perfectamente armo-

nizados y garantizados. La misma ley que le prohibe al deudor suspender o entorpecer el procedimiento, le señala el camino de proteger sus intereses. Sólo respetando la integridad de este procedimiento hipotecario, es como se realiza el espíritu de la Ley Hipotecaria que no es otro, sino el de afianzar y promover el crédito territorial, mediante la seguridad de la hipoteca y la expedita ejecución de su pago.'' *Banco Territorial y Agrícola* v. *Cuevas,* 8 D. P. R. 566; 20 D. P. R. 194; 18 D. P. R. 274.

La orden decretando la venta fué dictada el mismo día en que se dictó la orden que acabamos de citar o sea en octubre 2, 1917. La propiedad fué vendida en octubre 25 por la suma de $19,202. En el ínterin, o sea en 9 de octubre de 1917, estableció Polanco una acción para anular el procedimiento sumario a que hemos hecho referencia, para que se cancelasen todas las inscripciones que se hubieran hecho en el registro de la propiedad con motivo del mismo, y en reclamación de daños y perjuicios con costas, desembolsos y honorarios de abogado.

La teoría de la demanda presentada en este caso en tanto se trata de la nulidad del procedimiento ejecutivo se destaca suficientemente del cuarto y quinto párrafos de dicha alegación, los cuales son como sigue:

''IV. Que los demandados, si bien inscribieron en el registro de la propiedad el citado contrato de 27 de marzo de 1914, al folio 154 del tomo 16 de Gurabo inscripción 9ª. finca 301 no han hecho constar por medio de nota marginal, ni por otro alguno, en el mismo registro, el haberse contraído por el demandante las obligaciones futuras consignadas en este último contrato. Y así sin constar del registro de la propiedad la subsistencia y efectividad de la hipoteca constituída por el demandante, han promovido ante esta corte un procedimiento de ejecución de dicha hipoteca, de acuerdo con la ley y reglamento hipotecarios, sobre la referida finca de la propiedad del demandante, en cobro de la suma de $18,286.46, sin antes haber procedido a una liquidación de cuentas de las operaciones de refacción ajustada a los contratos mencionados en los párrafos segundo y tercero de esta demanda.

"V. Que en el mencionado procedimiento ejecutivo hipotecario los demandados, ejecutantes, en su escrito inicial omitieron señalar categóricamente las cantidades ciertas cobradas al deudor, aquí demandante, en concepto de intereses o a cuenta del capital de la deuda. No acompañaron, como debían, al referido escrito inicial, el título del crédito reclamado. Tampoco presentaron con dicho escrito un documento auténtico y fehaciente en que constase el importe exacto, líquido y exigible de la deuda. Y, además, alegaron falsamente, en el mismo escrito, que el día primero de agosto de 1917 los demandados, de conformidad con el ejecutado liquidaron la cuenta de refacción garantizada con la hipoteca. El demandante alega que dicha cuenta no ha sido liquidada de conformidad por ambas partes interesadas, sino que, por el contrario, los aquí demandados, ejecutantes hipotecarios, fijaron la suma de $18,286.46 como saldo a su favor, de una manera arbitraria y en violación de los contratos citados."

Los hechos declarados probados y las conclusiones a que llegó el juez sentenciador son los expresados por él como sigue:

"De las alegaciones de las partes y de la prueba practicada resulta, que el demandante Polanco constituyó una hipoteca, como obligación accesoria para responder del montante que pudiera quedar adeudando a los demandados por virtud de un contrato de anticipo sobre plantaciones de cañas de azúcar que vencería el año mil novecientos diecisiete, debiendo, en el plazo de cinco años porque se estableció dicho contrato, percibir los demandados como lo percibieron, el producto de la venta de todos los azúcares que produjeran las cañas del demandante. Vencido tal contrato, los demandados Goffinet sin liquidar previamente con el demandante la cuenta de refacción, y advertidos de la omisión de abono de cantidad que debieron acreditar al refaccionado, así como el exceso de cargo en la partida de intereses, y de otras circunstancias que les hiciera notar el demandante, los referidos demandados instaron un procedimiento ejecutivo hipotecario contra el demandante Polanco por un saldo de dieciocho mil doscientos ochenta y seis dólares cuarenta y seis centavos, fijado por los demandados exclusivamente, quienes comparecieron ante la corte, alegando que la cuenta había sido liquidada de conformidad con el refaccionado, y en tal virtud obtuvieron de este tribunal, que descansó

en las alegaciones contenidas en el escrito inicial del procedimiento ejecutivo hipotecario, la correspondiente orden de requerimiento dirigida al deudor.

"Poco después de expedida la orden de requerimiento, el Juez propietario de esta corte, obtuvo una licencia de dos meses para trasladarse a los Estados Unidos, y fué nombrado para sustituirle, con carácter de interino, el Hon. Rafael Rivera Zayas, ante quien compareció Polanco, ejecutado y demandante en este caso, en solicitud de que se reconsiderase la orden de requerimiento de pago por haberse obtenido dicha orden en virtud de una exposición de hechos falsa y maliciosa; a cuya moción de reconsideración se opusieron los demandados, y entonces ejecutantes, alegando entre otros motivos de oposición, que el ejecutado tenía abierto el camino que establece el artículo 175 del Reglamento Hipotecario para obtener, si fuere perjudicado, adecuada indemnización. La corte declaró sin lugar la moción de reconsideración y el juicio ejecutivo continuó por todos sus trámites, hasta venderse en pública subasta en veinticinco de octubre de mil novecientos diecisiete, la finca del demandante objeto del procedimiento hipotecario.

"De un examen cuidadoso de los hechos expuestos en armonía con la ley aplicable al caso, es de notarse que los demandados Goffinet no podían legalmente iniciar para el cobro de su crédito el procedimiento sumario, pues no habiendo aceptado el deudor Polanco el saldo de dieciocho mil doscientos ochenta y seis dólares con cuarenta y seis centavos, claro está que faltaba la condición indispensable exigida por el artículo 169 del Reglamento Hipotecario. Y que no hubo tal liquidación ni tal conformidad, aparece no sólo por la declaración del demandante Polanco, sino por la del propio apoderado de los demandados, quien manifestó no haberse llegado a un acuerdo en virtud de diferencias en el cómputo de los intereses y en la aplicación del tanto por ciento al liquidar las cañas molidas en la central, y con cuyo producto había de hacerse los reintegros a los demandados de acuerdo con los contratos de refacción. *Geo. P. Plant Milling Company* v. *Navas,* 22 D. P. R. 263.

"Cierto es que la corte pudo haberse negado a expedir el auto de requerimiento, pero el Juez, habiéndose alegado en el escrito inicial que la cuenta había sido liquidada de conformidad con el ejecutado, tenía derecho a descansar en esa aseveración.

"Las omisiones de que se ha hecho mención son bastantes a viciar de nulidad el procedimiento ejecutivo hipotecario de acuerdo

con la letra y el espíritu del artículo 128 de la Ley Hipotecaria en relación con el 169 de su reglamento.

"Conjuntamente con la acción sobre nulidad del procedimiento ejecutivo hipotecario, estableció el demandante una reclamación sobre daños y perjuicios, fundada sin duda en las disposiciones del mencionado artículo 169 de la Ley Hipotecaria que impone al ejecutante la obligación de cumplir determinados requisitos al iniciar el procedimiento y sujetando al acreedor hipotecario a indemnizar cuantos daños y perjuicios irrogare al deudor o a terceros interesados por malicia o negligencia en la fiel exposición de los hechos y circunstancias que ha de apreciar el Juez para autorizar el procedimiento y para continuarlo.

"Y los demandados consignaron en su escrito inicial la obligación de indemnizar al deudor o a terceros interesados, por malicia o negligencia en la fiel exposición de los hechos relacionados. Y no obstante esta protesta del acreedor hipotecario, es lo cierto que en el mencionado escrito se alegó falsamente que los acreedores ejecutantes de conformidad con el ejecutado, liquidaron la cuenta de refacción garantizada por la hipoteca, cuya liquidación de acuerdo con el escrito inicial arroja un saldo a favor de los acreedores por la suma de dieciocho mil doscientos ochenta y seis dólares cuarenta y seis centavos. Y la corte sostiene ahora que los demandados en este litigio fueron negligentes porque la negligencia nace de la infracción de un deber que ellos tenían para con el demandante Polanco, el deber de observar estrictamente los requisitos indispensables que determinan los preceptos de la Ley Hipotecaria y de su reglamento a que hemos hecho referencia. Y sostenemos asimismo que ha habido malicia por parte de los acreedores, señores Barones de Goffinet, no solamente en la manera infiel de exponer los hechos, y circunstancias que habría de apreciar la corte que concedió la orden de comenzar el procedimiento hipotecario, sino en la actitud por ellos asumida cuando el deudor hipotecario, ante el peligro de perder en un procedimiento sumario la posesión de su patrimonio, acudió solícito al tribunal en demanda de protección para sus intereses amenazados.

"Y en cuanto a este aspecto del litigio no hay otra prueba ante la corte que la del propio demandante, pues la parte demandada no introdujo evidencia alguna en refutación de la establecida por la parte actora, con la cual se ha tratado de establecer que el demandante Polanco ha sufrido con motivo de la desposesión de su finca, daños y perjuicios que se especifican de la manera siguiente:

| | |
|---|---:|
| Gastado en arado | $ 3,015.00 |
| Gastado en semillero | 2,375.00 |
| Producto del semillero | 4,000.00 |
| Gastado en construcción de nueve ranchos | 7,750.00 |
| Frutos civiles debidos producir desde octubre 25 de 1917 a enero 25 de 1919, a $349.20 cada mes | 5,238.00 |
| Total | $22,078.00 |

De estos apartados encontramos exagerados aquéllos que tienden a calcular lo gastado en arados, semillero y producto de semillas, entendiendo la corte que procede de una manera equitativa al fijar la cuantía de las mismas en la mitad de la suma reclamada por el demandante, haciendo por tanto un montante de cuatro mil seiscientos ochenta y cinco dólares. La partida de siete mil setencientos cincuenta dólares importe de lo gastado en la construcción de nueve ranchos, debe ser desestimada porque estos ranchos debieron formar parte del fondo reclamado, y si el demandante ha de recobrar la posesión de dicho fondo, es natural que lo obtenga con las construcciones que dicha finca tenía al tiempo del remate. Y por lo que hace a la partida de cinco mil doscientos treinta y ocho dólares que se ha fijado como montante de los arrendamientos debidos producir, entiende la corte que no debe alterarla porque la prueba en este respecto ha establecido ese hecho como una cosa concluyente, no sujeta a la apreciación de peritos sino de una manera categórica y firme, y no habiéndose controvertido dicha prueba, la corte debe aceptar el resultado de la misma como justa y razonable.''

Los acreedores hipotecarios interpusieron apelación de la sentencia dictada contra ellos y alegan que se han cometido los siguientes errores:

''1. La corte erró al declarar (*a*) que los demandados ejecutaron la hipoteca 'sin liquidar previamente con el demandante la cuenta de refacción,' y que fijaron el saldo de la misma exclusivamente; (*b*) al declarar aparentemente que los demandados omitieron abonar cantidades que debieron acreditar al refaccionado; (*c*) al declarar que había exceso en el cálculo de intereses, y (*d*) al declarar que habían algunas otras circunstancias que les hiciera notar el demandante.

''2. La corte erró al declarar que los demandados Goffinet no podían legalmente cobrar su crédito por el procedimiento ejecutivo hipotecario, porque el deudor Polanco no había aceptado el saldo de $18,286.46 que, según la corte, era 'condición indispensable exigida por el artículo 169 del Reglamento Hipotecario.'

"3 . La corte erró al condenar a los demandados a pagar daños y perjuicios.

"4. La corte erró al fijar los daños y perjuicios en la suma de $9,923.

"5. La corte erró por no haber resuelto y ordenado que los compradores de la finca, Jacinto y Florencio Polanco, que la adquirieron con conocimientos de la nulidad alegada en esta demanda, debieron rendir cuenta al demandante de los beneficios netos producidos por la misma desde el día del remate, octubre 25, 1917, hasta la fecha de su reintegro y pagar el montante de los mismos al demandante, menos intereses a un tipo razonable sobre el precio de $19,202.

"6. La corte erró o cometió abuso de discreción, al condenar además a los demandados a pagar los honorarios de los abogados del demandante."

Para los fines de esta opinión puede admitirse, aunque sin resolverse, que el derecho de los acreedores hipotecarios para exigir el pago de cualquier saldo debídoles y a ejecutar la hipoteca no dependía de la liquidación de cuentas entre Polanco y la Central Santa Juana por virtud del contrato de molienda. Solamente dos testigos, a saber, el demandante en su propio interés y el apoderado de los acreedores hipotecarios a nombre de la defensa, declararon respecto a la pretendida liquidación de la cuenta sobre anticipos refaccionarios. Después de un examen cuidadoso de esta prueba no podemos decir que la corte inferior cometió manifiestamente un error al declarar que los procedimientos de ejecución de hipoteca fueron establecidos "sin liquidar previamente con el demandante la cuenta de refacción," o que la cuestión relativa al importe de los intereses que según admitió el testigo de los demandados se discutían era tan insignificante que está comprendida en el principio de *de minimis non curat lex.*

Dejando a un lado la escueta manifestación de que la hipoteca "fué constituída para garantizar un préstamo refaccionario de $30,000 hecho por los acreedores hipotecarios al deudor hipotecario," y la referencia a un saldo liquidado, la demanda de ejecución de hipoteca no contenía absolutamente nada que demostrara o la cantidad adelantada, si alguna se

adelantó, cualquier crédito sobre dicha cantidad, cualquier saldo debido por ella o siquiera la existencia de la cantidad misma. Siendo esto cierto, cualquier error que pueda existir en los demás particulares mencionados en el primer señalamiento no parecería perjudicial si el lenguaje del juez sentenciador arriba expresado está sujeto a la interpretación que le dan los apelantes.

El razonamiento alegado en el segundo señalamiento trata de establecer una diferencia entre la certeza de la deuda a que se refiere el artículo 169 del Reglamento de la Ley Hipotecaria y su importe, y evitar así la aplicación de la doctrina anunciada en el caso de *George P. Plant Milling Company* v. *Navas,* 22 D. P. R. 273. Los apelantes dicen además que ni se llamó la atención de la corte ni consideró en ese caso la cuestión de tal distinción, ni la de dejar sin efecto la venta a diferencia de la mera negativa a ordenarla. Se sugiere que sobre la cuestión de dejar sin efecto una venta en ejecución de hipoteca "las irregularidades en el procedimiento original o en su notificación, *que no equivalgan a defectos fatales de jurisdicción,*" no pueden ser consideradas y que "*no se establecerá acción por razón de ningún defecto o irregularidades que no invaliden el título del comprador,*" y se cita el tomo 27 de Cyc., página 1712. Se indica además, por vía de analogía, "que para que pueda él tener derecho a un *injunction* por el fundamento de que la reclamación del acreedor hipotecario es excesiva, el deudor deberá haber ofrecido el pago de la suma que él reconoce deber o deberá hacer el ofrecimiento en su demanda de pagarla," citándose el tomo 19 R. C. L. 618. El caso de *Fleitas* v. *Richardson,* 147 U. S. 538, se cita asimismo extensamente para demostrar que a los fines de la jurisdicción conferida por el Congreso a las Cortes de Circuito de los Estados Unidos cuando las partes son ciudadanos de diferentes Estados el procedimiento ejecutivo que prevalece en Louisiana "es la acción civil *inter partes.*" No pretenderemos seguir al abogado de los ape-

lantes en los pormenores de su muy interesante e ingenioso razonamiento en estos particulares ni hemos tratado aquí de otra cosa que no sea indicar someramente la tendencia general de los mismos. Será bastante con decir que no hemos pasado por alto el razonamiento semejante fundado en los principios generales de la jurisprudencia española, la historia de la Ley Hipotecaria y la diferencia entre ellos como sustantivos y el procedimiento del reglamento de la Ley Hipotecaria para su cumplimiento. Considerar y contestar a todo esto en detalle extendería demasiado esta opinión.

Ningún caso ya resuelto ni ninguna autoridad española que se relacione directamente con la cuestión nos han sido presentados. El caso que tenemos ante nos no es un procedimiento en equidad para impedir una venta por una suma en exceso de la verdadera deuda. Y las autoridades americanas que tratan de ejecuciones de hipotecas en equidad en las que el deudor hipotecario tiene la oportunidad de defenderse alegando cualquier fundamento justo y razonable antes de que se dicte la orden, y donde todas las partes interesadas tienen una oportunidad amplia de ser oídas después de la venta y antes de que la misma sea ratificada, o de otro modo en muchos casos puede redimir la propiedad aún después, tienen únicamente poca o ninguna fuerza persuasiva en esta jurisdicción en un caso en que los acreedores hipotecarios han elegido, y a pesar de la oportuna objeción y verdadera protesta del deudor, insistido y negado a abandonar el procedimiento sumario de la Ley Hipotecaria. Una sola excepción a esta regla general aparece en las Decisiones de Louisiana, la que parece sostener tanto la doctrina enunciada por esta corte en el caso de *Plant Milling Company* v. *Navas,* como la conclusión a que llegó el juez sentenciador en el presente caso.

En el caso de Plant Milling Company resolvimos en sustancia que de acuerdo con la letra y el espíritu de la Ley Hipotecaria antes de que pueda dictarse orden de ejecución

deberá probarse la deuda de un modo indiscutible en alguna forma específica y auténtica, y que una cuenta jurada no suple este requisito.

En el caso de *Day* v. *Fristoe,* 7 Martin (serie anterior) 239, la Corte Suprema de Louisiana dijo hace más de cien años que "el privilegio de proceder por ejecución es un remedio concedido por la ley española en casos en que el demandante posee un título que implica una confesión de la sentencia."

En el caso *Wray* v. *Henry,* resuelto en agosto de 1821, se indicó lo siguiente:

\*       \*       \*       \*       \*       \*       \*

"Un juez en cámara no puede juzgar una cuestión de hecho, un asunto fuera de la corte, o sea la verdad o legitimidad de un endoso, o la firma de una parte bajo su autoridad (*sous seing prive*).   Todos los hechos positivos en un caso como el presente deben quedar establecidos ante él por actos auténticos.   El negativo, o sea que el dinero no ha sido pagado, está ante él, necesitaba probarse por el juramento del acreedor aunque hablando en términos generales uno no esté obligado a probar una negación.

"Si la orden de embargo fué expedida impropiamente el demandado sólo tenía que probar esto para procurar que fuese anulada. No necesitaba entrar en los méritos del caso."

En el caso de *Ward* v. *Douglass,* 22 La. Ann., página 463, se resolvió según expresa el sumario, que—

"Cuando las obligaciones hipotecarias han sido entregadas a factores o comisionistas para garantizar adelantos hechos y materiales suministrados a un agricultor y se formula una cuenta y un balance que muestran el importe adeudado por el agricultor, el comisionista no puede acudir al procedimiento ejecutivo, para el cobro del saldo que se reclama como debido aún cuando exista una hipoteca en garantía del saldo.

"En tal caso debe obligarse al factor a probar la certeza de su cuenta en oposición a lo que alegue el agricultor."

Véanse también los casos de *French* v. *The Mechanics and Traders Bank,* 4 La. Ann. 152; *Hoffman* v. *Steib,* 22 La. Ann. 267; *Van Raalte* v. *The Congregation of the Mission,* 39 La. Ann. 617 y *Bank of Leesville* v. *Wingate,* 123 La. Rep. 387.

Tampoco podemos convenir con los apelantes en que el procedimiento ejecutivo en Louisiana es más bien un procedimiento *ex parte* que el sumario de la Ley Hipotecaria. En esta Isla se permite al deudor presentar o prueba documental "de un procedimiento criminal por falsedad del título hipotecario en cuya virtud se proceda, en que se haya admitido querella o dictado auto de procesamiento," o sino un certificado del registrador "expresivo de quedar cancelada la hipoteca en virtud de la cual se proceda, o copia auténtica de la escritura pública de cancelación de la misma, con la nota de presentación en alguno de los registros en donde se haya de tomar razón de ella, otorgada por el autor o por sus causantes o causahabientes, acreditándose también documentalmente el título de transmisión en su caso." En el primer caso "subsistirá la suspensión hasta que termine la causa criminal, pudiéndose reanudar entonces el procedimiento si no quedase declarada la falsedad." En el segundo caso, "el juez convocará a las partes a una comparecencia, debiendo mediar cuatro días desde la citación; oirá a las partes, admitirá los documentos que presenten, y acordará en forma de auto lo que estime procedente dentro de segundo día."

Y en ambos efectos (bastardilla nuestra) "puede interponerse apelación contra esta resolución para que se suspenda y revise, *cuando ordenare la suspensión de los procedimientos.*"

Tal compensación que por estos inconvenientes otorga la Ley Hipotecaria al deudor hipotecario se halla en el siguiente párrafo:

"Todas las demás reclamaciones que puedan formular, así el deudor como los terceros poseedores y los demás interesados, incluso las que versaren sobre nulidad del título o de las actuaciones, o sobre vencimiento, certeza, extinción o cuantía de la deuda, se ventilarán en el juicio plenario que corresponda, sin producir nunca el efecto de suspender ni entorpecer el procedimiento ejecutivo."

Los artículos 738, 739 y 740 del Código de Práctica de Louisiana prescriben lo siguiente:

"Artículo 738.—El deudor contra quien esta orden de ejecución haya sido dictada puede obtener un *injunction* para suspender la venta si antes de la fecha de la venta formula en la corte que expide la orden su oposición por escrito alegando algunas de las razones contenidas en el siguiente artículo y cuya veracidad deberá jurar.

"Artículo 739.—El deudor sólo puede suspender la venta de la cosa que de tal modo ha sido incautada alegando algunas de las siguientes razones:

"1. Que ha pagado la deuda por la cual se le demanda.

"2. Que ha sido condonada por el acreedor.

"3. Que ha sido extinguida por transacción, novación o algún otro medio legal.

"4. Que se le ha concedido tiempo para pagar la deuda aunque esta circunstancia no se mencione en el contrato.

"5. Que el acto que contiene el privilegio o hipoteca es falso.

"6. Que se obtuvo por fraude, violencia, temor o algún otro medio ilegal.

"7. Que tiene una cuenta liquidada que alegar en compensación a la deuda reclamada.

"8. Y finalmente que la acción para el cobro de la deuda está prescrita.

"Artículo 740.—Cuando el juez concede un *injunction* por virtud de la alegación bajo juramento de cualquiera de las razones mencionadas en el artículo anterior no exigirá fianza alguna del demandado sino que se pronunciará sumariamente sobre los méritos de su oposición si el demandante lo requiere como se explica más adelante."

Además, según el criterio liberal adoptado por la Corte Suprema de ese Estado, el artículo 739 se limita en su aplicación a casos que envuelven la expedición de un *injunction* sin fianza; pero cuando se presta fianza queda restringida la ejecución de mandamientos de embargo y venta por causas que no sean sino las enumeradas en el referido artículo. Véase el caso de *Taft* v. *Donnes,* 105 La. 699 y casos citados; también el caso de *Hackmuller* v. *Figueroa,* 125 La. 307.

Y es por virtud de estas y otras prescripciones del Código de Louisiana interpretadas de tal modo por las cortes

locales y por las cuales ''la venta no puede tener lugar hasta que el deudor haya recibido aviso y tenido la oportunidad de presentar objeciones'' que la Corte Suprema de los Estados Unidos en el caso de *Fleitas* v. *Richardson* funda su conclusión de que ''este procedimiento por tanto es una acción civil *inter partes,* la cual cuando las partes son ciudadanos de diferentes Estados queda comprendida dentro de la jurisdicción que ha sido conferida por el Congreso a la Corte de Circuito de los Estados Unidos.''

Además, la proposición como ha sido planteada por los apelantes de si la aceptación por el deudor del saldo que el acreedor alega está vencido es o no un requisito previo indispensable a la acción favorable de la corte en una demanda de ejecución de hipoteca no es tan importante ni pertinente como lo es la investigación de que otra prueba, de haber alguna, presentaron los acreedores hipotecarios con relación al hecho de la deuda y a su importe, a la suficiencia de la alegación respecto al saldo líquido, sin más alegación, y al efecto de la falsedad de tal alegación cuando se demuestre que no es cierta después que la corte inferior había actuado dando crédito a ella en el sentido de suplir un elemento indispensable en el fundamento de su orden. En relación con esto es conveniente expresar de paso que el abogado que ha argumentado y sometido el caso a nombre de los apelantes en esta corte no consta que haya representado a los acreedores hipotecarios en los procedimientos sumarios que dieron lugar a la presente controversia.

La hipoteca envuelta en el presente caso en unión de la certificación del registrador respecto a su inscripción y el hecho de que no existe ninguna cancelación parcial o en otra forma, sin duda hubiera sido suficiente para demostrar la existencia de una deuda hasta el importe de $15,725.55 que ya debía Polanco en la fecha del otorgamiento de tal escritura, más los intereses vencidos sobre esa suma, si las partes no hubieran manifestado su intención de incluir ésta como

una partida en la cuenta corriente que existía. En cuanto al resto de los $30,000, cuya suma quedó en posesión de los acreedores hipotecarios para ser anticipada de cuando en cuando a petición del deudor hipotecario al tipo de cincuenta dólares por cuerda por caña de nueva plantación y veinticinco dólares por cuerda de los años subsiguientes, disponía, siempre que la condición y estado del cultivo de tal plantación a juicio del administrador de la central respondiera y garantizara debidamente la suma así exigida, no hay absolutamente nada ni en la hipoteca o en la demanda de ejecución con excepción solamente de la vaga y claramente inexacta referencia al préstamo de $30,000 de haber sido hecho y la alegación de un saldo liquidado de $18,286.46, que demuestre la existencia real de alguna deuda. Y según la manifestación del juez sentenciador resulta bastante claro que al librarse el mandamiento ordenando el pago del alegado saldo él se fundó en la afirmación solemne de los acreedores hipotecarios acerca de la liquidación previa de la cuenta.

Según los términos de la hipoteca es asimismo claro por lo menos en tanto se trata del futuro préstamo, si no lo es también en verdad respecto a toda la deuda, que la intención de las partes era garantizar cualquier saldo que pudiera deberse a los acreedores hipotecarios en cualquier fecha más bien que cualquier plazo individual o grupo particular de adelantos distintos y separados como fueron hechos u otras partidas cargadas en el debe de la cuenta corriente. *Durrive* v. *Key*, 20 La. Ann. 154; *Pickersgill* v. *Brown*, 7 La. Ann. 298. Y esto parece, fuera de toda duda razonable, haber sido la teoría de los acreedores hipotecarios en la petición para ejecutar la hipoteca.

"La Ley 27, título 13, Partida 5, conforme con los principios del derecho romano, que no pueden ser quebrantados sin confusión de la ciencia legislativa, estableció que en las obligaciones futuras la hipoteca comenzase cuando la obligación se realizara; de modo que, si uno hipoteca sus bienes en seguridad de un préstamo que se le debía

de hacer, y antes de entregarle la cantidad, la recibía de otro a quien hipotecaba igualmente la finca, éste era preferido, porque siendo el mutuo contrato real, se necesitaba la entrega de la cosa para que se considerase constituído; hasta entonces había una promesa de obligación, pero no una obligación perfecta y acabada, etc." 3 Galindo, 353.

"La estipulación de una hipoteca para garantizar un préstamo que no ha sido hecho es una obligación basada en una condición potestativa por parte del deudor. Las hipotecas convencionales de esa clase no rigen desde la fecha de su inscripción. No es el contrato mismo lo que forma el *vinculum juris* sino el cumplimiento de la condición. La hipoteca hubiera quedado ineficaz si el crédito no se hubiera usado, y sólo puede tener efecto desde la fecha y por el importe del préstamo. 2 Troplong, Hypotheque, Nos. 477–480." *Meeker* v. *The Commissioners of the Clinton & Port Hudson R. R. Co.,* 2 La. Ann. 971.

Véase también el caso de *Langfitt & Perry* v. *Ervin Brown, Administrator,* 5 La. Ann. 231 and *Morris* v. *Executors of Cain,* 39 La. Ann. 712.

Galindo y Escosura lamentan el hecho de que los autores de la Ley Hipotecaria se separen de este principio al ordenar que "la hipoteca constituída para la seguridad de una obligación futura o sujeta a condiciones suspensivas inscritas, surtirá efecto, contra tercero, desde su inscripción, si la obligación llega a contraerse o la condición a cumplirse." Artículo 142 de la Ley Hipotecaria. Pero la modificación se refiere a la cuestión de la forma y alcance en que el cumplimiento del contrato afectará a los derechos de terceros. La hipoteca aunque inscribible queda como antes incompleta y sólo surte efecto al cumplirse la condición suspensiva; por tanto, la consumación de tal modo efectuada se retrotrae inmediatamente a la fecha del documento en cuanto a las partes y al asiento de la nota marginal a que se refiere el artículo 143, a la fecha de la inscripción en tanto en cuanto se trata de derechos de terceros. Galindo y Escosura, volumen y página *supra.* En pro de la brevedad hacemos referencia aunque sin citarlos a los artículos 143 y 128 de la

Ley Hipotecaria, 178 y 169 del Reglamento, y 1427 y 1465 de la antigua Ley de Enjuiciamiento Civil.

Escriche define el "juicio ejecutivo" como "un juicio sumario en que no se trata de declarar derechos dudosos y controvertidos, sino sólo de llevar a efecto lo que ya está determinado por el juez o consta evidentemente de uno de aquellos títulos que por sí mismos hacen prueba plena y a que la ley da tanta fuerza como a la decisión judicial."

En el caso de *Arvelo* v. *Banco Territorial y Agrícola,* 25 D. P. R. 728, en el cual se sigue la doctrina enunciada en el de *Early* v. *Doe,* 57 U. S. 609, 617, esta corte dijo:

"El procedimiento seguido por el Banco Territorial y Agrícola de Puerto Rico contra la Sucesión de Hilario Arvelo era un procedimiento sumario, especial y *ex parte,* y debieron observarse estrictamente las prescripciones de la Ley Hipotecaria y su reglamento."

No necesitamos ahora resolver si como se ha insistido por el apelado de acuerdo con el artículo 1776 del Código Civil la inscripción en el registro de alguna prueba auténtica del cumplimiento de la condición potestativa es o no esencial para la validez de la hipoteca en cuanto a las partes en ella. Puede o no ser cierto que ni la relación detallada de las varias sumas realmente adelantadas con el debido crédito de todos los pagos hechos ni la alegación de un saldo liquidado, sin otra cosa, sea bastante para justificar la expedición de la orden disponiendo el pago.

Más de lo necesario se ha dicho para demostrar que en el caso de autos la alegación respecto a la liquidación de la cuenta y el saldo que se convino era debido, siendo esa la única prueba en cuanto a la consumación del contrato de hipoteca o respecto a la existencia de cualquier deuda, era cuestión de importancia vital cualquiera que fuera la regla general que regule los casos que revelan alguna otra base adecuada para establecer el procedimiento.

Que con respecto a todas las demás cuestiones con excep-

ción de la de estar pendiente procedimientos criminales por falsedad de la escritura de hipoteca o la verdadera cancelación de esa obligación probada por la certificación del registrador o por medio de copia auténtica de un documento público, el procedimiento sumario de la Ley Hipotecaria es puramente *ex parte* como se resolvió por esta corte en el caso de *Arvelo et al.* v. *Banco, supra,* parece ser demasiado claro para ser discutido.

No estamos dispuestos ahora por consiguiente a considerar detenidamente las sutiles distinciones que existen entre la palabra "corrección" o "certeza" de la deuda y su "importe", ni entre las razones que hay para negar la expedición del auto requiriendo de pago al deudor y los fundamentos para anular los procedimientos después de la venta. El acreedor hipotecario que prefiere ejercitar su derecho a este remedio drástico, debe tener cuidado de cumplir con los requisitos prescritos que en cierto modo protegen al deudor hipotecario contra el abuso intencional o negligente de tal derecho; o de otro modo estar preparado para afrontar la obligación impuéstale por la ley y que por necesidad ha asumido expresamente en la solicitud para la ejecución de la hipoteca, en el caso de no hacerse "una verdadera exposición de los hechos y de las circunstancias que el juez debe tomar en consideración al autorizar el establecimiento de los procedimientos y seguir adelante con ellos."

En el alegato de los apelantes el error alegado en·el quinto señalamiento se considera como comprendido en y suplementario al tercero por vía de argumento para sostener el mismo. La teoría de los apelantes en cuanto a este aspecto del caso es en sustancia que de acuerdo con el artículo 169 del Reglamento, la causa de la presente acción estriba en la "malicia o negligencia al no hacer una fiel exposición de los hechos y las circunstancias que ha de apreciar el juez al autorizar el procedimiento y para continuarlo;" que la alegación del demandante en este caso en cuanto a la falta

de una liquidación de común acuerdo implica que la suma reclamada excedía en los procedimientos de ejecución de hipoteca de lo que verdaderamente adeudaba a los demandados; que cualesquiera daños y perjuicios que pudieran habérsele ocasionado por virtud de esta falsa alegación en este sentido, sería la diferencia entre la suma así reclamada y el importe de la verdadera deuda con intereses, costas, gastos y quizás honorarios de abogado; que la sentencia debió haber ordenado que las cosas quedaran en el mismo estado en que se encontraban (*status quo*); esto es, que dicha sentencia no solamente debía haber ordenado la devolución al demandante de su propiedad vendida en procedimiento de ejecución de hipoteca sino que debió haber hecho un pronunciamiento comprensivo de los frutos producidos por la finca desde la fecha del remate; que si la conformidad en cuanto al montante de la deuda no es un requisito previo para poder establecer procedimientos de ejecución de hipoteca, no ha habido ni negligencia ni malicia en la falsa alegación en cuanto a tal alegada conformidad y por consiguiente no existe causa de acción contra los demandados por daños y perjuicios. En relación con esto, los apelantes citan el tomo 27 de Cyc., página 1472; *Stevens* v. *Clay*, 3 Pac. 43; *Shears* v. *Traders Building Association*, 52 S. E. 860; *Las Vegas Railway Power Company* v. *T. R. Company de St. Louis*, 126 Pac. 1009, y los artículos 436 y 457 del Código Civil para indicar que la doctrina de *caveat emptor* es de aplicación a ventas en ejecución de hipoteca; que los compradores en tales ventas son responsables y deben rendir cuenta de las rentas y beneficios y que la corte inferior debió haber ordenado en este caso que se hubiera rendido tal cuenta.

Si los acreedores hipotecarios hubieran establecido demanda de ejecución de hipoteca, de acuerdo con el Código de Enjuiciamiento Civil, el deudor hipotecario no solamente hubiera tenido una oportunidad amplia para defender y proteger sus derechos, cualesquiera que fueran, en el procedi-

miento, sino que en el curso ordinario del mismo hubiera
quedado en posesión de la finca hipotecada por un período
aproximadamente igual a aquél durante el cual él ha estado
privado de su uso pendiente de la recuperación que trata
de obtenerse en el presente caso.  La pérdida sufrida du-
rante la continuación de tal privación parece ser el resul-
tado directo y natural del hecho injustificado y malicioso de
acudir al procedimiento sumario de la Ley Hipotecaria y a
la vez un método razonable de estimar los daños y prejuicios
así causados.  Es bastante para contestar a lo demás del
argumento del tercer y quinto señalamientos, como han sido
combinados por los apelantes, en todo aquello en que no haya
sido considerado en nuestra discusión de otras cuestiones.
*supra,* que si los apelantes deseaban traspasar su responsa-
bilidad a los compradores en la venta en ejecución, entonces
debieron haber solicitado que tales compradores hubieran
sido hecho partes en la corte inferior para que después de
oírseles debidamente su responsabilidad y su cuantía pu-
diera fijarse.  No solamente se hace demasiado tarde la su-
gestión cuando se formula por primera vez en apelación, sino
que el precio de venta que asciende a más del doble del im-
porte de la sentencia dictada en este caso está aún en poder
de los apelantes y el cumplimiento de tal sentencia sin per-
juicio de cualquier reclamación que puedan tener para ser
subrogados y reintegrados, no les puede ocasionar gran in-
conveniente.

En el cuarto señalamiento se sugiere que las partidas re-
ferentes a arados, preparación de semilleros y el producto
de tales semilleros se incluyeron en el precio de la venta de
la finca.  Pero, como acabamos precisamente de indicar, el
importe de la venta está en poder de los apelantes y o los
compradores o los acreedores hipotecarios, no los deman-
dantes, han obtenido los beneficios del dinero y trabajo in-
vertidos.  Además, los apelantes expresan que el demandante
debía haber depositado en la corte el importe de su deuda

como fué reclamada en los procedimientos de ejecución de hipoteca, evitando de este modo las pérdidas ocasionadas, y que sus hermanos estaban en condiciones de.poder prestarle el dinero necesario.   Pero no consta que el demandante pudo hacer esto, y ciertamente sus hermanos no tenían ninguna obligación de anticipar dinero para este fin.   La declaración del demandante sobre esta cuestión es que él tenía el dinero en la fecha en que se trató de hacer la liquidación de las cuentas y que en esa ocasión ofreció pagar en efectivo cualquier cantidad que importara el verdadero saldo, pero que después de iniciarse los procedimientos sumarios, otros acreedores hicieron presión y obligaron a que se transara otra cuenta pendiente, haciendo así imposible para él presentarse como postor en la venta de la finca hipotecada.   Insiste también en que no hubo ninguna connivencia o convenio secreto entre él y sus hermanos que obtuvieron la buena pro de la finca y que él fué lanzado de la posesión por ellos después de tal adquisición.   Los apelantes no citan ninguna autoridad ·sobre esta cuestión que no sea el principio general de que ·"no puede haber indemnización por pérdidas que pudieran haberse evitado mediante razonables esfuerzos por parte de la persona perjudicada."   La cita de este principio no está favorecida por los acreedores hipotecarios, quienes, con el fin de aprovecharse del procedimiento sumario de la Ley Hipotecaria y de la incapacidad del deudor hipotecario según los preceptos terminantes de esa ley para poder impugnar la veracidad de las alegaciones jurisdiccionales han recurrido a la medida de tergiversar deliberadamente los hechos en la corte lo que equivalía a un fraude.   Dentro de las circunstancias, no estamos fuertemente convencidos con la sugestión hecha de que debe aplicarse de un modo estricto el principio general en cuestión a los hechos de este caso en particular.

La alegación de que la compensación fijada por la corte inferior no corresponde a la pérdida o perjuicio se basa en

la teoría ya expuesta y resuelta de que el demandante tiene un derecho de acción contra los compradores en la venta en ejecución de hipoteca para que se rinda una cuenta en cuanto a las rentas y ganancias. Ni puede inferirse de la mera posibilidad de una supuesta pérdida de dinero empleado en arado y en la preparación de los semilleros de tabaco por no cosecharse o no poder disponer de la semilla del tabaco al precio de venta en el mercado aún cuando el demandante había quedado en posesión de la finca, que los daños así estimados son demasiado vagos y remotos para fundar en ellos la sentencia. La prueba en estos autos estableció un caso *prima facie,* teniendo los demandados la obligación de probar que el dinero de tal modo invertido en realidad no produjo ninguna ganancia o que no hubiera producido ninguna de no haber sido lanzado el demandante. Y finalmente, la omisión del juez sentenciador en descontar contribuciones e intereses de hipotecas, incluyendo las de los apelantes que se dice hubiera tenido que pagar el demandante, difícilmente puede considerarse como error, puesto que no hay nada que demuestre que los demandados u otras personas en realidad han pagado tales contribuciones e intereses, o que el demandante no quedará obligado à tener luego que pagar ambas cosas.

La teoría de la demanda y de la corte inferior respecto a lo que constituye una medida adecuada de daños y perjuicios en un caso de esta naturaleza no ha sido impugnada en su aspecto general en el cuarto señalamiento; y en tanto la misma se refiere meramente a la suficiencia de la prueba para sostener las varias partidas que forman el importe total de la suma especificada en la sentencia, no encontramos que exista ningún error tan manifiesto en la fijación de tales sumas por el juez sentenciador que requiera modificación.

Ni tampoco podemos decir que consideradas todas las cosas, la corte inferior abusó de su discreción en cuanto a los honorarios de abogado como se sugiere en el sexto señalamiento de error.

La sentencia apelada debe ser confirmada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf, del Toro y Aldrey.